STATE of Wisconsin, Plaintiff-Respondent,†

v.

Chad E. GOETSCH, Defendant-Appellant.

Court of Appeals

*No. 92–2816–CR. Submitted on briefs October 8, 1993.—Decided May 19, 1994.*

(Also reported in 519 N.W.2d 634.)

†Petition to review denied.

1

For the defendant-appellant the cause was submitted on the briefs of *Margaret A. Maroney*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Marguerite M. Moeller*, assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

SUNDBY, J. On November 8, 1989, Chad E. Goetsch shot and killed his mother with a bow and arrow. The State charged him with first-degree intentional homicide, § 940.01, STATS. The State charged him in a second count with first degree recklessly endangering the safety of his stepfather by his use of the bow and arrow, § 941.30(1) and § 939.63(1)(a)3, STATS. A jury convicted him on both counts. He appeals from the judgment of conviction and an order denying his postconviction motion seeking a new trial on the grounds of ineffective assistance of counsel and in the interest of justice. We affirm the judgment and order.

Goetsch concentrates on his conviction for killing his mother. He does not deny that he killed her but claims that he shot her accidentally when she startled him while he was "fiddling with his bow and arrow."

## THE ISSUES

The parties agree as to the issues presented, although they state them somewhat differently. We identify the following issues:

(1) Did the police violate Goetsch's right to remain silent under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 8 of the Wisconsin Constitution when they continued to question him after he stated to the interviewing officer: "I don't want to talk about this any more. I've told you, I've told you everything I can tell you. You just ask me any questions and I just want to get out of here"? We conclude that Goetsch invoked his right to silence; however, admission of the statements he made after he invoked his right to silence was harmless error.

(2) Did the trial court err in refusing to suppress evidence obtained during a search of Goetsch's car? We conclude that Goetsch consented to the search and therefore the evidence obtained in that search was admissible.

(3) Was Goetsch's trial counsel ineffective? We conclude that Goetsch's trial counsel provided him with effective representation.

(4) Should we grant Goetsch a new trial in the interest of justice because the real controversy was not fully and fairly tried? We conclude that the real issues as to whether Goetsch killed his mother accidentally and whether he recklessly endangered his stepfather's safety were fully tried.

## I.

## GOETSCH'S RIGHT TO SILENCE

"The critical safeguard of the right to silence is the right to terminate questioning by invocation of the right to silence." *State v. Hartwig*, 123 Wis. 2d 278, 284, 366 N.W.2d 866, 869 (1985) (citing *Michigan v. Moseley*, 423 U.S. 96, 103 (1975)). The exercise of the defendant's right to silence must be "scrupulously honored." *Id.* Whether a defendant invoked his right to silence is a question of law which we decide independently by applying constitutional principles to the facts as found. *Id.* at 283, 366 N.W.2d at 869.

Goetsch was given his *Miranda*[1] warnings and was interrogated by Detective Gerald Beier of the Dodge County Sheriff's Department at the hospital and at the county jail. After Detective Beier had interrogated Goetsch for some time, he asked the following question and Goetsch gave the following answer:

Q. So you're changing your story then right?

A. No, I'm telling you that she ran, she ran through the living room into the hallway where she collapsed. At that point my father came out and tried to [maul] me or something. I don't know, I don't know, *I don't want to talk about this anymore. I've told you, I've told you everything I can tell you.* You just ask me any questions and I just want to get out of here. Throw me in jail, I don't want to think about this. [Emphasis added.]

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

In *State v. Bishop*, 621 P.2d 1196, 1198 (Or. Ct. App. 1980), the defendant was held to have exercised his right to silence when he said: "I don't want to talk about it." The State distinguishes *Bishop* on the grounds that Goetsch's statement was immediately followed by further remarks which clarified that he was willing to answer questions but wanted the police to hurry up so the interrogation could be concluded. The State relies on that part of Goetsch's response in which he said: "You just ask me any questions and I just want to get out of here." That response standing alone is ambiguous.[2] However, in the context of the entire interrogation, it is apparent that Goetsch was speaking of the previous questioning and he did not consent to continued questioning.

The State also relies on *State v. Lindh*, 161 Wis. 2d 324, 468 N.W.2d 168 (1991). However, the facts in *Lindh* are dramatically different from the facts in this case. In his interview with Dr. Roberts on the day of the shootings, Lindh advised Dr. Roberts that he did not want to discuss the details of the shootings. The supreme court said that that alone was not an invocation of the right to silence, and concluded that Lindh never exercised or invoked his right to silence during his interview with Dr. Roberts. *Id.* at 369, 468 N.W.2d at 185. He did not say he did not want to answer additional questions. *Id.* He did not ask Dr. Roberts to end

[2] In *State v. Walkowiak*, 183 Wis. 2d 478, 515 N.W.2d 863 (1994), the court held that upon an equivocal statement by a suspect as to his need for an attorney, all interrogation should have ceased. *Id.* at 486-87, 515 N.W.2d at 867. We need not decide whether, upon an equivocal assertion of a suspect's right to silence, interrogation must cease. In this case we conclude that any ambiguity in Goetsch's invocation of his right to silence was resolved when the entire interrogation is considered.

8

the interview or to go away. *Id.* On the other hand, Goetsch clearly told the police to "go away."

The State further contends that the admission of Goetsch's responses to the continued questioning was harmless because Goetsch maintained his innocence and did not make any inculpatory statements. We do not accept the State's characterization of Goetsch's interrogation. The entire atmosphere of the interrogation was accusatory. For example, Detective Beier stated to Goetsch: "I think you intentionally shot her." In the continued interrogation he focused on inconsistencies in Goetsch's previous statements. Further, at least one of Goetsch's admissions could have been regarded by the jury as inculpatory. Detective Beier asked him the following questions and Goetsch gave the following answers:

Q. She walked in?

A. Yah, and I dumped it.

Q. You dumped it?

A. Lost it, *I don't know what I did.* [Emphasis added.]

While our view of Goetsch's interrogation by Detective Beier differs from that of the State's, we nonetheless conclude that, given the weight of the evidence against Goetsch, there is no reasonable possibility that Goetsch's responses after he invoked his right to silence contributed to his conviction. *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985).

The jury heard expert opinion testimony that the distance between the point of the arrow and the entry wound when Goetsch shot his mother was only four to sixteen inches, and the distance between Goetsch's

mouth and the entry wound was no more than 4.01 feet. This evidence discredited Goetsch's testimony that he was startled by his mother's voice, which caused him to lose control of the bow.

Goetsch had driven from Milwaukee to his home, arriving in the early morning hours of November 8, 1989. He parked his car in a field approximately 1200 feet from his home. He testified that he was restless and after walking for an hour or two, returned home and awakened his mother, Carolyn Goetsch. She got a blanket for him to sleep on the couch in the den. Goetsch testified that he was unable to sleep and decided to "check out" his archery equipment. He went to his downstairs bedroom and got his bow and arrow and returned to the den. He loaded the bow when, suddenly, he heard his mother's voice and in his surprise, he jerked and lost control of the bow string. However, his bow case was found in the trunk of his car, from which the jury could have inferred that he brought the bow and arrows with him on the night of the shooting with the intent to use the bow and arrows as a weapon. The jury also heard testimony that there were no lights on in the den where he had claimed he was adjusting his bow.

Goetsch's stepfather testified that he was awakened by his wife's screams and the sound of her running down the hallway. He saw Goetsch in the hallway, not in the den; Goetsch was holding a bow loaded with an arrow pointed his direction. He testified that he lunged forward, reached out and broke off the tip of the arrow, sustaining a cut to his hand.

Goetsch's mother's screams also woke his half-sister, Shana. She testified she saw her father break "a bow" and fight with Goetsch in the hallway. Goetsch followed Shana into the kitchen and started hitting her

on the arms and chest. Shana picked up a knife and began to stab him. Robert Goetsch separated the two and continued fighting with Goetsch in the dining room.

Goetsch admits that his family "was dysfunctional with a high level of conflict." The family exchanged threats as a way of working through family conflict. In November 1987, a deputy sheriff was dispatched to the Goetsch home in response to a report that Goetsch had struck his stepfather. The deputy learned from Goetsch that he was upset because the day before his parents had stranded him in Madison. According to Goetsch's mother, Goetsch "destroyed" his room and left a note reading: "Nothing would please me more tha[n] your deaths, too bad I'm so old . . . ." In December 1988, Goetsch attempted suicide.

The jury also heard testimony that Goetsch's mother threatened Goetsch that she would get a gun and kill him. Goetsch's stepfather testified that his wife's fear that Goetsch would kill her prompted her to begin locking her doors at night and caused her to consider buying a gun. In the face of this evidence, Goetsch's statements after he had invoked his right to silence are cumulative and only minimally inculpatory.

We conclude that the error in admitting statements made by Goetsch after he had exercised his right to remain silent could not reasonably have contributed to his conviction. The error was harmless. *Dyess*, 124 Wis. 2d at 543, 370 N.W.2d at 231-32.

## SEARCH OF GOETSCH'S CAR

Immediately after Detective Beier finished interrogating Goetsch, he was instructed by the district attorney to get Goetsch's consent to a search of his car and dorm room. Goetsch concedes that if he voluntarily consented to a search of his car, there was no need for a warrant. Section 968.10(2), STATS.; *Kelly v. State*, 75 Wis. 2d 303, 310, 249 N.W.2d 800, 804 (1977). He argues, however, that the "fruit of the poisonous tree" doctrine prevented his consent from being voluntary. He cites *Florida v. Royer*, 460 U.S. 491, 507-08 (1983). Royer, however, was being illegally detained when he consented to the police search of his luggage. *Id.* at 507. Goetsch does not claim that he was being illegally detained when he gave his consent.

Nonetheless, the State had the burden of proving that Goetsch's consent to search his car was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. *Id.* at 497. The *Royer* court stated that had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him. *Id.* at 502. In *Royer*, the search of the defendant's luggage was truly the "fruit of the poisonous tree" because Royer's consent "was tainted by the illegality [of his detention] and was ineffective to justify the search." *Id.* at 508.

We conclude that the State met its burden of proving that Goetsch's consent to search his car was freely and voluntarily given. Detective Beier taped his inter-

view with Goetsch in which the police sought his consent to search his car and his apartment. Detective Beier asked the following questions and Goetsch gave the following answers:

Q. Chad, do you have any objections to either myself . . . or any other law enforcement officer of the Dodge County Sheriff's Department, searching your car?

A. No.

. . . .

Q. . . . Are you aware that the very short conversation we had about searching your car, and your dorm, was placed on a tape recording?

A. Yes.

Q. And you [have] no problem with that consent?

A. No problem.

Goetsch does not deny that he consented to the search of his car; however, he claims that his consent was the fruit of Detective Beier's illegal interrogation and therefore was not voluntary. Goetsch cites *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). In *Wong Sun*, the police used a statement made by a defendant in the course of an unlawful, warrantless arrest to locate narcotics. The Court concluded that the narcotics should have been excluded from evidence because the police would never have found the drugs had they not obtained a statement from Wong Sun made in the course of an unlawful arrest.

The Court said that not all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. *Id.* at

487-88. The Court further stated that "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 488 (quoting JOHN M. MAGUIRE, EVIDENCE OF GUILT 221 (1959)). Here, the evidence obtained in the search of Goetsch's car was not "come at" by information learned in the course of Goetsch's interrogation. In his interrogation, Goetsch did not disclose evidence that would be found in his car; there was no discussion of his car or evidence which might be found therein. We therefore conclude that Goetsch's consent to the search of his car was not the "fruit" of the "poisonous" interrogation. Because of our conclusion that Goetsch voluntarily consented to the search of his car, we need not decide whether the police had probable cause to obtain the search warrant.

## III.

## EFFECTIVE ASSISTANCE OF COUNSEL

Goetsch contends that his trial counsel failed to provide him with effective assistance. First, he claims that counsel should not have provided his expert medical witness, Dr. Braaksma, with the report of Dr. March, who interviewed Goetsch at the instance of the attorney who represented Goetsch during pretrial proceedings. Goetsch argues that had it not been for that disclosure, Dr. March's report would not have been discoverable by the State. At the hearing on Goetsch's postconviction motion, Goetsch's expert legal witness testified that a reasonably prudent attorney would not have released Dr. March's report to Dr. Braaksma

because Dr. Braaksma's review of the report made the report discoverable. Goetsch asserts that Dr. March's report contained highly prejudicial statements Goetsch made which were not contained in other psychiatric and psychological reports. The State argues that we should not consider Goetsch's claim because he did not raise this issue in his postconviction motion and his trial counsel did not have a meaningful opportunity to address this accusation at the postconviction hearing.

The State's arguments are not supported by the record. Goetsch's postconviction motion alleges that trial counsel's disclosure of Goetsch's confidential statements to Dr. March was deficient performance. At the hearing on Goetsch's postconviction motion, his appellate counsel asked the following question of Goetsch's trial counsel and counsel gave the following answer:

Q. Did you have any tactical reason for including Dr. March's report in the materials that you gave Dr. Braaksma?

A. I thought Dr. March's report was very good. And if Dr. March had been in the state, I probably would have used him because it seemed that he had a good handle on Chad and understood the up and down situation.

He also stated unequivocally that he could testify that he thought [the shooting] was accidental.

I told Chad that we were going to be looking for another expert to go into the family dynamics and that I would be sharing information.

15

We conclude that the issue of trial counsel's performance in this respect is properly before us. We read trial counsel's tactical reason for providing Dr. Braaksma with a copy of Dr. March's report to include that he wanted Dr. Braaksma to be well informed as to the "dynamics" of the Goetsch family. We conclude that Goetsch failed to overcome the strong presumption that counsel rendered adequate assistance. *Strickland v. Washington*, 466 U.S. 668, 690 (1984).

Second, Goetsch argues that trial counsel should not have stipulated to the accuracy of the "9-1-1" call to the police. The effect of the stipulation was to agree that Goetsch said "he's tellin' on me," rather than "he's killin' me," describing his stepfather's actions. Trial counsel agreed that he and the district attorney listened to the "9-1-1" call "numerous" times. Trial counsel testified that he spent "many, many hours" working with the district attorney on transcripts of all tape-recorded statements, including the "9-1-1" transcript. Goetsch does not fault his trial counsel for his diligence in attempting to decipher the "9-1-1" transcript. He argues that counsel should have sought an expert's assistance in analyzing the tape or he should have informed the jury that Goetsch disagreed with the State's interpretation of the tape.

During the postconviction motion hearing, Goetsch's expert witness testified that an aural inspection of the "9-1-1" tape showed that the tape was inaudible at the disputed section. Goetsch's expert witness testified that if someone claimed to hear the phrase "he's tellin' on me" on the "9-1-1" tape, that person would be in error.

Goetsch's argument would carry more weight if his trial counsel had doubted what was said on the tape

16

but stipulated anyway. However, trial counsel testified that he believed that the transcript of Goetsch's "9-1-1" call was accurate. Goetsch's counsel apparently saw no need to retain an expert witness to analyze the tape. In hindsight, he may have made the wrong decision. However, we do not examine trial counsel's performance with hindsight; we judge counsel's performance according to the facts available to counsel at the time. We cannot say that counsel was so negligent in stipulating to the accuracy of the transcript that his performance was constitutionally deficient.

Further, we conclude that Goetsch did not show that this alleged error "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. Goetsch has failed to show how a misinterpretation of what he said during the "9-1-1" call prejudiced his defense. Presumably, Goetsch's argument is that his statement "he's tellin' on me" negated Goetsch's self-defense theory as to his stepfather while the statement "he's killin' me" would support that defense. However, the jury heard Goetsch testify that he did not reload the bow with the second arrow and that his stepfather charged him, seized an arrow from the quiver and broke it over his knee. His stepfather testified that Goetsch had rearmed the bow and that he broke the arrow in self-defense. The physical facts support Goetsch's stepfather's version of what happened. Goetsch's stepfather was hospitalized after the incident and was treated for a number of facial injuries and a cut to his hand. We conclude there was no reasonable probability that the jury would have reached a different result if the transcript of Goetsch's "9-1-1" call had been silent as to Goetsch's stepfather's acts. We therefore conclude that

Goetsch has failed to show that trial counsel's performance was deficient in this respect.

Third, Goetsch argues that trial counsel's performance was deficient in failing to present to the jury that Goetsch's stepfather requested that action be taken to disqualify Goetsch from inheriting or receiving any trust fund proceeds under § 852.01(2m), Stats. Trial counsel testified that he rejected impeaching Goetsch's stepfather on this basis because he believed that the jury would be offended at the suggestion that Goetsch's stepfather would lie for financial gain.

Goetsch's stepfather was a member of the Wisconsin State Assembly. Trial counsel explained, "I felt that a jury is not going to believe that someone like [Goetsch's stepfather] would lie to inherit, would put his stepson in prison to inherit thirty or forty thousand dollars. I did not think that that was a good theory of defense."

We refuse to second-guess trial counsel's decision in this respect. He was more familiar with the local situation than are we. We cannot conclude that his decision was tactically unsound.

Fourth, Goetsch argues that trial counsel's handling of the testimony of Jennifer Bolstad was deficient. When asked at trial whether Goetsch said anything about the deaths of his parents, Bolstad testified that he said he really couldn't go on with them there but said nothing beyond that. The prosecutor then impeached Bolstad with her preliminary hearing testimony in which she stated that Goetsch said that his parents would have to die in order for him to live his life. Bolstad then admitted that Goetsch once mentioned killing his parents. The prosecutor also impeached Bolstad with her prior statement to Detec-

tive Beier. The State argues that admission of these statements was proper because both were prior inconsistent statements and admissible under § 908.01(4)(a)1, STATS.

We need not decide whether Bolstad's prior statements were consistent or inconsistent with her testimony. Trial counsel expressed a tactical reason for his failure to object to the impeachment of Bolstad. As to the prosecutor's questioning of Bolstad using Detective Beier's report, counsel testified that he believed her initial answers to the prosecutor's questions were vague and incomplete. Counsel hoped that the prosecutor's questions based on Detective Beier's report would clarify the ambiguities in Bolstad's testimony.

Counsel also testified that he did not object to the introduction of Detective Beier's report because he thought it contained "more positive things in [it] than negative for Chad." Counsel hoped that the jury would note the "condescending and sweet-talking" way Detective Beier tried to get Bolstad to say what he wanted her to say. He hoped that the jury would thus be sympathetic to the argument that in the shock following the death of her boyfriend's mother, Bolstad would have said whatever Detective Beier wanted her to say. Further, Goetsch's counsel testified that there were items in the report he couldn't otherwise mention, including allegations of abuse of Goetsch as a child and the dysfunction in the Goetsch family.

Counsel expressed sound tactical reasons for his failure to object to the attempted impeachment of Bolstad's testimony. We will not second-guess that decision.

Fifth, Goetsch argues that trial counsel should have impeached Bolstad with her prior inconsistent statement to the public defender's trial assistant,

19

Deborah Cudworth. Cudworth testified at the postconviction motion hearing that Bolstad told her that she did not tell the police officers that Goetsch said he wanted to kill his parents. Trial counsel testified that "you have to understand that Jennifer Bolstad for me was like quicksand." He testified that on the morning of the trial, "I told her, 'Jennifer you have to tell the truth; I'll give you an opportunity to clarify but you have to tell the truth.' "

Counsel's strategy was to give Bolstad the opportunity to tell the jury that Goetsch's statement to her was a figurative expression; in other words, that Goetsch did not mean it literally when he said to Bolstad "in order for me to live, my parents have to die." Counsel testified that there were many things he didn't object to that he knew technically were objectionable. However, he considered it the better trial strategy to keep it simple and attempt to convince the jury that Goetsch did not mean it literally when he talked about his parents having to die, rather than attempting to convince the jury that Detective Beier was "forcing" her to relate to him what Goetsch had said as to his desire to see his parents dead. Trial counsel related that Goetsch told him repeatedly that after Goetsch's conversations with Bolstad, "she's going to say they told her to say it and she lied." Counsel testified "that just never happened."

Counsel pointed out that Bolstad never denied unequivocally that Goetsch had said he wanted to kill his parents and that they had to die before he could live. Counsel testified that his strategy was to give Bolstad a chance to explain, rather than deny, the statements Goetsch had made to her. We cannot conclude that trial counsel's strategy was deficient

20

performance. Even in hindsight, it appears to us that counsel's trial strategy was more likely to succeed than a strategy which required the jury to believe Bolstad rather than Detective Beier.

Finally, Goetsch argues that trial counsel performed deficiently when in closing argument he did not address Goetsch's defense to or the facts underlying the charge that he had recklessly endangered the safety of his stepfather while possessing a dangerous weapon. Counsel testified that his tactical reason for not arguing the second count was to have the jury focus on the shooting of his mother: "The fact that there was so much chaos; that it was confusing; that it was at night; that people were half asleep." He believed that if the jury were sympathetic to Goetsch on that count or in that set of circumstances, they would also be sympathetic to Goetsch with respect to the recklessly endangering safety charge.

Counsel testified that he wanted to stay completely away from Goetsch's and his stepfather's conflicting testimony as to the arrow incident in which the stepfather claimed he had been cut; he did not want the jury to remember any of that. Counsel further testified that "near the end of our preparation, I believe [Goetsch] was convinced that the best approach was a lower key approach, emphasizing the dysfunction in the family and the accident."

We cannot conclude that counsel's trial strategy constituted deficient performance. Counsel chose to concentrate on the death of Goetsch's mother where Goetsch's explanation of how her death occurred could not be contradicted by eyewitness testimony. Goetsch's confrontation with his stepfather, however, was experienced by his stepfather and observed by his stepsister.

Counsel believed, not unreasonably, that Goetsch's story as to how the confrontation with his stepfather occurred would be disbelieved by the jury and that disbelief would affect the jury's assessment of Goetsch's credibility when he testified that he accidently killed his mother. We therefore conclude that trial counsel's strategy in concentrating in closing argument on the killing of Goetsch's mother was not deficient performance.

## IV.

## NEW TRIAL

Goetsch argues that we should grant him a new trial in the interest of justice. Goetsch argues that his case falls squarely within the category of cases where a discretionary reversal is appropriate because the real controversy was "so sidetracked and clouded that it may accurately be said that it was not fully tried." *State v. Wyss*, 124 Wis. 2d 681, 739, 370 N.W.2d 745, 772 (1985), *overruled on other grounds by State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990). Goetsch argues that the jury did not hear important evidence regarding the bias of Goetsch's stepfather and Bolstad's credibility; that the jury heard evidence which should have been excluded of Goetsch's statements to Dr. March and the false representation of the "9-1-1" call; and that the jury did not hear Goetsch's defense to his stepfather's claim that Goetsch reloaded the bow.

Goetsch's arguments are simply a rehash of his arguments as to the ineffective assistance of counsel. Because we have found that trial counsel's performance was not deficient, we refuse to exercise our

discretion under § 752.35, STATS., to grant Goetsch a new trial. We conclude that the real controversy as to whether Goetsch intentionally killed his mother and whether he recklessly endangered his stepfather's safety was fully tried.

*By the Court.*—Judgment and order affirmed.