CITY OF OSHKOSH, Plaintiff-Appellant,

v.

Steven J. WINKLER, Defendant-Respondent.

Court of Appeals

*No. 96–0967. Submitted on briefs October 31, 1996.—Decided November 20, 1996.*

(Also reported in 557 N.W.2d 464.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Lynn A. Lorenson*, assistant city attorney, and *Warren P. Kraft*, city attorney.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Stephen J. Meyer* of *Meyer Law Office* of Madison.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J. This case primarily concerns whether student disciplinary action under University of Wisconsin system rules constitutes "punishment" which triggers double jeopardy protection. We conclude that it does not.[1]

---

[1] This appeal originated as a one-judge appeal. Upon its own motion, this court assigned it to a three-judge panel. *See* RULE 809.41, STATS.

The University of Wisconsin—Oshkosh placed Steven J. Winkler on "disciplinary probation" after a Student Conduct Hearing Committee found that he had violated university rules. This administrative discipline resulted from Winkler's participation in a student riot near campus. While Winkler does not challenge the university's administrative action, he nonetheless contends that the City of Oshkosh's attempt to prosecute him under its disorderly conduct ordinance is barred by the double jeopardy clause.

We hold that the university's disciplinary action was not a form of punishment triggering double jeopardy protection. We thus reverse the circuit court's decision to dismiss the City's case on these grounds. Moreover, we also explain why the City did not waive its right to raise certain arguments challenging this ruling even though it did not present them in anything resembling a comprehensive analysis to the circuit court.

We have gathered the background facts from the evidentiary hearing on Winkler's motion to dismiss. There, an officer from the City's police department explained how on April 27, 1995, a large group of students gathered outside a university dormitory around 12:00 a.m. after a fire alarm had been set off. By about 2:00 a.m., the students started proceeding from the dormitory to downtown Oshkosh, committing various acts of vandalism. The officer suggested that the student violence was in response to his department's raid of a campus beer party earlier that evening. The police made a total of 122 arrests that night.

The officer specifically cited Winkler for "jumping up and down on [a] dumpster" that had been pushed into the street near his dormitory. Winkler explained at this hearing how he was in his room around mid-

540

night and went outside when someone told him that "there's a riot on the street." When Winkler came downstairs, he saw that some of his friends were dancing on top of the dumpster and he jumped up to join them.

The riot was captured on videotape by local news crews and the officer was therefore able to identify Winkler and issue him a citation for disorderly conduct. As it pertains to Winkler's conduct, this ordinance prohibits "conduct" which "tends to cause or provoke a disturbance." CITY OF OSHKOSH, WIS., ORDINANCES § 18-10.[2]

The university also responded to Winker's conduct. It charged him with violating a total of six provisions of the administrative code regulating student behavior. We set out a complete list of the charged provisions in the margin.[3]

However, we are really concerned with only two of the administrative charges, those under WIS. ADM.

---

[2] The entire ordinance provides:

**Section 18-10 DISORDERLY CONDUCT**

No person shall within the City, in a public or private place, engage in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance; or with intent to annoy another, make a telephone call, whether or not conversation ensues.

[3] The university originally charged Winkler with violating the following six provisions: WIS. ADM. CODE § UWS 17.06(1) (June 1995) (intentional conduct causing serious danger to others); § UWS 17.06(4) (June 1995) (intentional conduct impairing university activity); § UWS 17.06(6) (June 1995) (impairing traffic); § UWS 18.06(23)(a)3 and (23)(a)4 (May 1996) (unauthorized rallying); and § UWS 18.06(30) (May 1996) (disorderly conduct).

CODE §§ UWS 17.06(4) (June 1995)[4] and 18.06(30) (May 1996), because these are the provisions most analogous to the City's disorderly conduct ordinance. And although the Student Conduct Hearing Committee only found that Winkler violated § UWS 17.06(4), we must also consider § UWS 18.06(30) because the double jeopardy clause not only prevents the state from punishing a person twice for the same conduct, but the clause also bars the state from trying to punish a person after he or she has once been charged and acquitted. *See United States v. Halper*, 490 U.S. 435, 440 (1989).

First, § UWS 17.06(4) is aimed at "intentional conduct" which "impairs" a university-authorized activity. The provision further explains that the conduct it is directed to is the type that "prevents the effective carrying on of the activity." Section UWS 17.06(4). Second, § UWS 18.06(30), which is labeled "disorderly conduct," prohibits conduct which "tends to cause or provoke a disturbance," just like the City ordinance does. *See* OSHKOSH ORDINANCES, § 18-10.

■

With the above materials in hand, we can now turn to the merits of whether the university's disciplinary action against Winkler was a form of punishment that activated the double jeopardy clause and now prevents the City from pursuing its ordinance violation. This is a question of law and we therefore owe no deference to the circuit court's determination that double jeopardy applies. *See State v. Thierfelder*, 174 Wis. 2d 213, 218, 495 N.W.2d 669, 672 (1993). We further observe that

---

[4] The university rules within ch. UWS 17 that Winkler was charged under have been amended or replaced by new regulations effective September 1, 1996. See the introductory note to ch. UWS 17 (May 1996).

Winkler bears the burden of establishing beyond a reasonable doubt that the City's attempt to apply its ordinance violates the double jeopardy clause. *See State v. Iglesias*, 185 Wis. 2d 117, 133, 517 N.W.2d 175, 180, *cert. denied,* 115 S. Ct. 641 (1994).

■■■■

The Wisconsin Supreme Court recently analyzed the double jeopardy clause in *State v. Carpenter*, 197 Wis. 2d 252, 541 N.W.2d 105 (1995).[5] There, the court explained that the determination of whether a sanction constitutes punishment triggering the double jeopardy clause depends on the purpose served by the sanction. *Id.* at 264, 541 N.W.2d at 109 (citing *Halper*, 490 U.S. at 447 n.7). If the *principal* purpose of a regulation is punishment, retribution or deterrence, then that regulation is a sanction which triggers double jeopardy protection. *See id.* at 264, 541 N.W.2d at 109-10.

We first note that the language of the two university rules and City ordinance suggest that they are all aimed at the same type of disruptive conduct. *Compare* §§ UWS 17.06(4) and 18.06(30) *with* OSHKOSH ORDINANCES, § 18-10. Thus, in line with the *Carpenter* analysis, Winkler expectedly argues that the university's disciplinary sanction was "meant to deter the defendant (and others) from future conduct of that sort."

---

[5] At the outset of its analysis, the supreme court noted that the double jeopardy provisions of the federal and Wisconsin constitutions are similar in scope and purpose. *State v. Carpenter*, 197 Wis. 2d 252, 262-63, 541 N.W.2d 105, 109 (1995). It further explained that Wisconsin's double jeopardy jurisprudence has therefore tracked federal jurisprudence. *Id.* at 263, 541 N.W.2d at 109. Thus, we subject Winkler's federal and Wisconsin constitutional claims to the same analysis.

The City responds, however, that the university rules are aimed at maintaining institutional order, rather than deterring improper behavior. It contends that the rules and administrative enforcement mechanism are designed to identify individuals within the university community who engage in disruptive conduct that poses a threat to the learning environment.

To buttress this contention, the City points first to WIS. ADM. CODE § UWS 17.01 (June 1995), which states that the purpose of this disciplinary action is to "preserve the orderly processes of the university with regard to its teaching, research and public service missions."[6] Moreover, the City draws a facially awkward, but otherwise persuasive analogy between the administrative rules applying to university students and those applying to individuals confined in Wisconsin prisons. It explains how Wisconsin courts have recognized that prison officials may enforce good conduct rules to preserve institutional order without triggering double jeopardy protection. *See State v. Quiroz*, 149 Wis. 2d 691, 692, 439 N.W.2d 621, 622 (Ct. App. 1989). Finally, the City cites to foreign case law in which courts have held that a state criminal sanction does not bar subsequent disciplinary action by a state univer-

---

[6] We observe that the updated policy statement from the amended regulations contains similar language. It states in pertinent part:

> The board of regents, administration, faculty, academic staff and students of the university of Wisconsin system believe that the teaching, learning, research and service activities of the university can flourish only in an environment that is safe from violence and free of harassment, fraud, theft, disruption and intimidation. The university has a responsibility to identify basic standards of nonacademic conduct necessary to protect the community, and to develop procedures to deal effectively with instances of misconduct . . . .

WIS. ADM. CODE § UWS 17.01 (May 1996).

sity. *See, e.g., Paine v. Board of Regents*, 355 F. Supp. 199, 203 (W.D. Tex. 1972) ("the Regents' Rule mandating automatic suspension of student drug or narcotic offenders is intended to protect the university community."), *aff'd*, 474 F.2d 1397 (5th Cir. 1973).

After comparing the university rules to the City ordinance, we acknowledge that they are similarly drafted. Moreover, we acknowledge that the university and the City could use similar methods to accomplish their respective goals. For example, each entity has the authority to assess fines. *See* § 36.11(1)(a) and § 66.115, STATS.

However, based on the legislative evidence that the purpose of the university rule is to maintain institutional order, we conclude that the university's disciplinary action is not a punitive sanction triggering the double jeopardy clause. The plain language of § UWS 17.01 tells us that the purpose of these administrative sanctions is to "preserve the orderly processes of the university." Faced with such language, we are not persuaded that the university's student discipline process may only be characterized "as a deterrent or retribution." *See Carpenter*, 197 Wis. 2d at 264, 541 N.W.2d at 110 (quoted source omitted).

The legislature granted the Board of Regents the authority to make and enforce rules directed against members of the university community who obstruct the smooth operation of the system. *See* § 36.11(1)(a), STATS. While we concede that the methods that the university has at its disposal—imposing fines—may have the ancillary benefit of deterring similar conduct among the university population, we are nonetheless persuaded that the primary purpose of the university rule-making and enforcement process is to identify

those persons who act disruptively and signal to them that such conduct will not be tolerated within the learning environment of a university setting. We thus reverse the judgment of the circuit court dismissing the City's action. The City may proceed in its prosecution of Winkler.

While the above analysis disposes of this case on the narrowest possible grounds, *see State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989), we note that we do not reach any additional reasons why the City's prosecution of Winkler might not raise double jeopardy concerns. For example, we have merely assumed that the City's prosecution of its ordinance was punishment under the double jeopardy clause. This is not necessarily so. *See State v. Kramsvogel*, 124 Wis. 2d 101, 114, 369 N.W.2d 145, 151, ("we hold that the ordinance violation was a civil proceeding"), *cert. denied*, 474 U.S. 901 (1985).

We will now briefly explain why we did not apply waiver to the City's arguments concerning the nonpunitive nature of the university's disciplinary action as Winkler claims we should have.

We do agree with Winkler's assertion that the City provided the scantiest of argument to the circuit court on the issue of double jeopardy. The City's counsel only offered brief statements during oral argument such as "I think this is the same argument that's being used in O.W.I. cases" and "I don't think the court is buying this at this point in time as to administrative rules and double jeopardy and I think the same thing applies here in this case." Indeed, the City's counsel conceded to the court that he "did not get a lengthy period of time to research this."

Because the City offered the circuit court just this brief explanation, Winkler argues that we should apply

546

waiver to the City's appellate discussion of this issue, which is much more detailed. He specifically cites this court's decision in *State v. Rogers*, 196 Wis. 2d 817, 539 N.W.2d 897 (Ct. App. 1995), for the following rule:

> [A] party seeking reversal may not advance arguments on appeal which were not presented to the trial court.

*Id.* at 826, 539 N.W.2d at 900. Because the City did not give as detailed a presentation to the circuit court as it has to this court, Winkler contends that we must follow the above rule and waive the claim that the City now places before us.

Winkler, however, puts too much emphasis on the word "argument" within the *Rogers* rule. Because the City has done a much better job detailing its position about "administrative rules and double jeopardy" by providing case authority and detailed analysis, Winkler believes that the City has raised new "arguments."

But when this court used that term in *Rogers*, we were not referring to additional authority or legal analysis. Rather, we used it to describe an entirely new *theory* that the appellant was trying to advance. *See id.* at 827, 539 N.W.2d at 901 ("We cannot allow the State to advance its two new theories in this interlocutory appeal").

In fact, while we mentioned above that we need not address every reason why the City's prosecution does not present a double jeopardy problem to effectively resolve this case, we note that the City has raised these other issues. If we had to address those issues, however, the *Rogers* rule might well have applied because the City did not raise these alternative theories in its limited argument before the circuit court.

Finally, we expressed concern in *Rogers* about "blindsid[ing] trial courts with reversals based on theories which did not originate in their forum." *See id.* Nonetheless, our decision to reverse the circuit court on the basis of information that was never brought to its attention does not present a similar problem. Even the short argument outlined above gave the circuit court some idea of the City's position. If the court did not feel comfortable making a ruling because of the limited depth of the City's analysis, it could have simply requested further briefing.

*By the Court*—Judgment reversed and cause remanded.