StATE of Wisconsin, Plaintiff-Appellant,

v.

Heather A. MARKWARDT, Defendant-Respondent.†

Court of Appeals

*No. 2006AP2871–CR. Submitted on briefs August 30, 2007.*
*—Decided October 31, 2007.*

2007 WI App 242

(Also reported in 742 N.W.2d 546.)

† Petition to review denied 1/22/08.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Marguerite M. Moeller*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Richard Hahn* of *Holden & Hahn, S.C.*, Sheboygan.

Before Brown, C.J., Anderson, P.J., and Nettesheim, J.

¶ 1. ANDERSON, P.J. In this case, Heather A. Markwardt was advised of her *Miranda*[1] rights and waived them at the outset of a police interrogation. One

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

hour and eleven minutes into the interrogation, after being repeatedly accused of lying, Markwardt exclaimed, "Then put me in jail. Just get me out of here. I don't want to sit here anymore, alright? I've been through enough today." The circuit court held that this statement was an unequivocal announcement that Markwardt now wished to exercise her right to remain silent. While it is reasonable to conclude that this was such an invocation, it would also have been reasonable to conclude that her statement was just part of the "thrust-and-parry" going on between her and her interrogator in regard to the interrogator's claims that she was lying. Because more than one reasonable inference can be drawn from Markwardt's statement, the law requires that it not be considered an "unequivocal" invocation of the right to remain silent. We therefore reverse. Also, contrary to the circuit court's conclusion, we hold that Markwardt's statements to the interrogator were voluntarily made. We reverse and remand with directions.

### Facts

¶ 2. The following facts are not in dispute.[2] At 1:50 p.m. on March 22, 2006, Sheboygan police received

---

[2] The wording of part of Markwardt's statement to Detective Joel Clark is in dispute. Regardless of which party is correct on what it heard on the compact disc recording of the interrogation, it does not change our conclusion that Markwardt's statements amounted to, at most, an equivocal invocation of her right to remain silent. We nonetheless address this dispute.

At one hour and twenty-seven minutes into the interrogation Markwardt contends that she said, "I should just remain silent." The State contends that Markwardt said: "I should just have remained silent."

a report of a shooting at 1623 Sibley Court in the city of Sheboygan. The first officers to arrive saw a female, later identified as twenty-two-year-old Trisha L. Bergemann, lying on her back in an upstairs bedroom, unresponsive but breathing. The officers observed an apparent bullet hole on the right upper portion of her skull. Also present at the house were Emily Butler, who was tending to Trisha, Laura Butler, Travis Butler and Emily's young children.

¶ 3. Travis told police that Trisha was his brother James Butler's girlfriend. Travis said Trisha and James had been in an upstairs bedroom of the residence when he heard "a bang" and a "small shriek" coming from upstairs. Travis said he heard Markwardt say, "Why did you do that?" Travis said he went to the

---

The trial court did not make a factual finding on this statement nor did it base its ruling that Markwardt invoked her right to remain silent on this statement.

After carefully listening to this part of the interrogation, we note that Markwardt and Clark speak at the same time and their individual comments are somewhat difficult to discern. Though, both parties are correct in that Markwardt says something about "remain silent."

What is discernable is Markwardt's comment made immediately after this first reference to silence. She, in fact, sounds as if she is repeating or clarifying her previous comment on silence. In any case, in this statement Markwardt clearly can be heard saying: "I should've just remained silent." Clark's response indicates that he understands her to be commenting on what she should have, but did not do, "You had that option; you definitely had that option."

Upon our independent review, we conclude that Markwardt's statements regarding the right to remain silent were equivocal and it was reasonable for Clark to have understood, as it seems he did, Markwardt's statements as nothing more than lament as to what she should have, but did not do.

upstairs bedroom and saw Emily holding a towel to Trisha's head. Travis then called 911.[3]

¶ 4. Emily told police she was downstairs in the residence and heard an argument taking place upstairs. Emily said she did not hear a shot, but heard a "thud" like someone thrown to the floor. She said as she went upstairs, James Butler was coming down the stairs holding a handgun that, based on Emily's description, was a black semi-automatic handgun. Emily said that James banged the gun against a wall making a statement about the gun jamming. Emily said James left the house and she thought he left with Markwardt.

¶ 5. In the bedroom of the shooting, police located a .45 caliber casing, a spent bullet lodged in the wall, as well as a black satchel carrying case containing numerous female effects along with a pay stub in the name of Heather Markwardt. Police noted that Markwardt's vehicle was not present at the scene and issued a statewide alert to locate her black Chevrolet Blazer.

¶ 6. From these initial interviews with the Butler family members at the scene, the police learned that Norman Butler, Markwardt's boyfriend, had left the house after the shooting. The police located Norman walking a few blocks from the crime scene and transported him to the Sheboygan Police Department where he was interviewed. Norman told the police that James and Trisha were in Norman's bedroom while he and Markwardt were in the upstairs bathroom. He said both he and Markwardt heard a "bang" followed by what Norman termed a "click." Then, he said, he heard James saying, "It jammed, it fucking jammed." Norman said he did not hear any serious argument between Trisha and

---

[3] Trisha L. Bergemann was transported to St. Nicholas Hospital, then transferred to Froedtert Hospital and later died.

James before the shot. He said he entered the bedroom and saw James with "something black" in his hand and Trisha gasping for breath with her eyes partially open. Norman stated James was hysterical, screaming and asking, "Is she dead? Is she dead?"

¶ 7. At approximately 2:30 p.m., Detective Michael Bloedel, of the Jackson Police Department, received the message to look for a Chevy Blazer in connection with a Sheboygan county homicide; the names James D. Butler and Heather Markwardt were mentioned. Ten minutes later, Bloedel saw a Blazer matching the description he had been given and he began to follow it. Bloedel and other officers activated lights and sirens to make a stop. Almost immediately thereafter, the rear window of the Blazer shattered. The Blazer continued about 200 feet, then pulled over to the right side of Highway 60 and stopped. Markwardt exited the driver's side of the Blazer, screaming and hysterical. The police ordered her to the ground at gunpoint. James Butler was found inside the Blazer with a gunshot wound to the forehead and back of his head and a .45 caliber semi-automatic gun at his feet. He was later pronounced dead at an area hospital.

¶ 8. After being handcuffed, Markwardt was placed in the back seat of a squad car. While Markwardt was sitting in the squad, Bloedel asked how many shots James had fired. She said just the one shot to his head. Markwardt also made remarks indicating that she did not know what was going on or what had happened.

¶ 9. Markwardt was taken to the Jackson Police Department; still in handcuffs, she was initially placed in a holding room. At approximately 4:45 p.m., Lieutenant Leroy Shaw took Markwardt out of the holding room and removed her handcuffs. Shaw interviewed

Markwardt for approximately twenty minutes and recapped the version of events Markwardt gave to him:

> She had initially gone to her boyfriend's house, a Norman Butler. When she got there, the front door was standing open . . . . Her boyfriend's brother, James Butler, was upstairs talking to a female . . . . She couldn't tell who James was talking to because the female's voice was muffled . . . . [S]he started going upstairs towards the voices. James suddenly came running downstairs and stated that she had to take him somewhere. They had to leave right away. She followed . . . got into a car. She was driving and James was a passenger in the car, and he just basically told her to drive. He . . . was making various statements about, "Oh, my God, what have I done?" She was asking him what happened. He wasn't responding to that [and said] . . . "Tell my family that I love them." And as she was trying to see the police, who are now activating the red lights, she heard a gunshot next to her. She pulled over and could see that James was shot, and she jumped out of the car and ran back towards the police.

¶ 10. Before the interview, Shaw let Markwardt use the restroom so she could clean up some of the blood that was on her. He also gave her a soda and took her outside so she could smoke a cigarette. Shaw informed Markwardt that she was neither under arrest nor suspected of committing any crimes in Jackson county. Shaw said he did not advise Markwardt of her *Miranda* rights because she was not in custody.

¶ 11. Detective Joel Clark of the Sheboygan Police Department arrived in Jackson to interview Markwardt about the events that took place at the Sibley Court residence in Sheboygan. The room in which Clark interviewed Markwardt was well-lit, measured about six feet by eight feet, and contained a table and chairs.

¶ 12. Clark introduced himself to Markwardt and told her he did not know whether the Jackson police considered her to be in custody. Markwardt told Clark that she was told that she was not in custody. Clark then read Markwardt her *Miranda* rights and gave her a copy of the rights so she could follow along. Markwardt signed a written waiver of her rights at 5:44 p.m. Before questioning Markwardt, Clark explained that he was not going to take into account what she had already told other officers and he emphasized the importance of telling the truth:

> It's very important that you tell the whole truth, don't leave anything out. Because realize that there are lots of other people that have been talked to already. And, you know, if your story is different than them, we'll have to figure out why. And that just is not a good situation all the way around. So, and more important than that, this is just an extremely important thing and if there was a time to just lay the cards down and tell the truth, today is that time.

Thereafter, Markwardt gave Clark three separate accounts of what had happened.

¶ 13. In her first account, Markwardt stated that she had been at her mother's house in Sheboygan when Norman Butler phoned her and that she went to the Sibley Court residence about twenty minutes later. Upon entering the Sibley Court residence, she stated that there were people running up and down stairs and that James Butler approached her and asked her for a ride in a hysterical state and that she left the residence with James.

¶ 14. Approximately twenty-five minutes into questioning, Clark pointed out to Markwardt that her account did not match what Norman Butler had told

other detectives.[4] Markwardt then told Clark a second version of the events. This time she said she went to the Sibley Court residence with a backpack. She said she saw James and Trisha in Norman's bedroom when she knocked on the door in order to put her backpack in the bedroom. Markwardt said she was in the upstairs bathroom with Norman and could hear James asking Trisha, "Who did you fuck?" at least three times. She said she then heard a loud "bang" and that Norman entered the bedroom while James exited it. She said she did not see what had happened in the bedroom. Markwardt said James immediately asked her for a ride. She said she did not see a gun and that she even told James he better not have a gun in her vehicle. She said James denied having a gun. Markwardt maintained that she had no knowledge of the gun until James shot himself while in her car in Jackson. She stated that she believed James was trying to avoid police because he told her to drive "good" so they would not be stopped and because he directed her away from police squads that he observed while en route.

¶ 15. Clark asked Markwardt to "write down everything that you can remember" and he left the room so she could do so. After dating the written statement, Clark asked Markwardt whether she swore that the statement was the truth, and she said, "[Y]es." Clark reread the *Miranda* rights and asked Markwardt if she remembered them, to which she responded, "Hm hmm."

---

[4] In their appellate briefs, the State and Markwardt agree that this is the point at which Markwardt was taken into custody. The State acknowledges that "[a]lthough Clark gave Markwardt *Miranda* warnings before questioning her, arguably the first time she would have believed she was not free to leave was when Clark first accused her of lying during their interview."

Clark then informed Markwardt that detectives had obtained statements from Norman, Emily, Laura and Travis Butler that matched one another but did not match her statement.

¶ 16. At one hour and eleven minutes into the interrogation, Markwardt said, "Then put me in jail. Just get me out of here. I don't want to sit here anymore, alright. I've been through enough today."

¶ 17. Clark continued to press for the truth and eventually Markwardt admitted she had entered the room after Trisha was shot and saw Trisha bleeding from her head. However, Markwardt denied knowing about the gun before that day and said it was not in the backpack she brought to the house.

¶ 18. Ultimately, when Clark said he knew who took the gun to the Sibley Court residence, Markwardt told a third version of the events. She said she did not know James was going to leave his gun at her house but that he had done so the previous weekend. She said that she wanted the gun out of her house and that when Norman called her to come over that day he told her James was there and to bring the gun over. She admitted that she brought the gun to the Sibley Court residence in her backpack and had put her backpack in Norman's bedroom where James and Trisha were located. She stated that she agreed to give James a ride away from the shooting because she "had some feelings for him and didn't want him to get into trouble." She also stated that she was aware that James had previously been in prison.

¶ 19. Markwardt agreed to write another statement. Clark turned off the recorder at 8:21 p.m. When the recorder was turned back on, Clark indicated that while it was off, Markwardt had finished writing her statement and was allowed to go outside for a cigarette

break. Clark reminded Markwardt of her *Miranda* rights but did not administer them a third time. When the interview ended at 8:50 p.m., Markwardt apologized to Clark for lying and said, "I'm sorry I've been lying to you too . . . . I mean I would have told you the truth right away but I'd already told [Lieutenant Shaw] one thing . . . ."

¶ 20. On March 24, 2006, Markwardt was charged with possession of a firearm by a felon—PTAC, as a party to a crime—furnishing firearm to a felon, contrary to Wis. Stat. §§ 941.29(2)(a), 939.05, 941.29(4), and harboring or aiding a felon, contrary to Wis. Stat. § 946.47(1)(a).

¶ 21. Markwardt moved to suppress for use as evidence all statements obtained from her by police and any evidence derived therefrom, on the grounds that the statements were obtained in violation of her rights under the Fifth Amendment to the United States Constitution and article I, section 8 of the Wisconsin Constitution or, on the grounds that her statements were involuntary or, on the grounds that her statements were the product of an illegal "sew-up" interrogation.[5] The circuit court granted Markwardt's motion providing the following rationalization:

> The statement was in violation of *Miranda* rights and was involuntary. I will address the *Miranda* rights first. Ms. Markwardt exercised her *Miranda* rights. She said, "Just get me out of here," and followed up with, "Put me in jail." This was one hour and 11 minutes into the interview. The interrogation continued. That is a violation of her *Miranda* rights. She had a right to terminate the interrogation.
>
> I will next address the voluntariness issue. The

---

[5] The "sew-up" argument is not at issue on appeal.

issue is whether her statements were the result of a free and unconstrained will. They were not considering the totality of the circumstances. Ms. Markwardt had just witnessed a suicide by gunshot to the head and had blood on her clothing. She was 18 years old. She had no prior experience with police interrogations. The interrogation was very emotional. Ms. Markwardt cried several times; sometimes wailing, sometimes sobbing.

The tone of the interrogation was loud and confrontational. The custody and interrogation were lengthy. She was in custody commencing at about 3:00 p.m. She was initially in handcuffs, then placed in a holding cell. The interrogation by Detective Clark commenced at 5:44 p.m. and lasted over two hours. The interrogation was improper in that it was continued after the first hour in violation of the defendant's right to terminate the interrogation. So, in conclusion, the motion to suppress is granted.

¶ 22. The State of Wisconsin appeals.[6]

### Relevant Law

¶ 23. *Right to Remain Silent.* In *Miranda v. Arizona,* 384 U.S. 436, 467 (1966), the Supreme Court formed a set of procedural guidelines designed to protect a suspect's rights under the Fifth Amendment from the "inherently compelling pressures" of custodial interrogation. *State v. Harris,* 199 Wis. 2d 227, 237–38, 544 N.W.2d 545 (1996). A suspect's right to counsel and the

---

[6] The State of Wisconsin appeals, pursuant to WIS. STAT. § 974.05(3) (2005–06), which states: "Permission of the trial court is not required for the state to appeal, but the district attorney shall serve notice of such appeal or of the procurement of a writ of error upon the defendant or the defendant's attorney."

All references to Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

right to remain silent are separately protected by these procedural guidelines. *Miranda*, 384 U.S. at 467–73.

¶ 24. A suspect's right to remain silent includes two separate protections. The first is the right, prior to questioning, to remain silent unless the suspect chooses to speak in the unfettered exercise of his or her own will. *See id.* at 460. The second is the right to cut off questioning. *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). "Through the exercise of [a suspect's] option to terminate questioning he [or she] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103–04. Therefore, the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his or her right to cut off questioning was scrupulously honored. *Id.* at 104.

¶ 25. The key question is whether the suspect, after being informed of the *Miranda* rights, invokes any of those rights during police questioning. *State v. Ross*, 203 Wis. 2d 66, 74, 552 N.W.2d 428 (Ct. App. 1996). Once the right to counsel is invoked, all police questioning must cease, unless the suspect later validly waives that right and "initiates further communication" with the police. *Miranda*, 384 U.S. at 473–74; *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

¶ 26. In *Ross*, we adopted a "clear articulation rule" as the measure of whether a suspect has invoked the right to silence.[7] *See Ross*, 203 Wis. 2d at 75–76. A suspect must unequivocally invoke his or her right to

---

[7] In *Ross*, we noted that Wisconsin courts have already merged the "clear articulation rule," set forth in *Davis v. United States*, 512 U.S. 452 (1994), into Wisconsin jurisprudence with

remain silent before police are required either to stop an interview or to clarify equivocal remarks by the suspect. *Id* at 75–79. This "clear articulation rule" adopts the same analysis used to assess whether a suspect has invoked the right to counsel during interrogation. *Id.* at 70, 74–75.

¶ 27. Specifically, the *Ross* rule is derived from the right-to-counsel law developed by the Supreme Court in *Davis v. United States*, 512 U.S. 452, 460–62 (1994). In *Davis*, the Supreme Court declared that in order for a suspect to invoke the right to counsel, "the suspect must unambiguously request counsel." *Id.* at 459. Accordingly, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer, in light of the circumstances, would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

¶ 28. In order to unambiguously invoke the right to remain silent, "[a] suspect must, by either an oral or written assertion or non-verbal conduct that is intended by the suspect as an assertion and is reasonably perceived by the police as such, inform the police that he or she wishes to remain silent." *Ross*, 203 Wis. 2d at 78. Similar to an invocation of the right to counsel, " 'a suspect need not speak with the discrimination of an Oxford don,' but must articulate his or her desire to remain silent or cut off questioning 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' an invocation of

respect to a suspect's invocation of the right to counsel. *State v. Ross*, 203 Wis. 2d 66, 75, 552 N.W.2d 428 (Ct. App. 1996) (referencing *Davis* and *State v. Coerper*, 199 Wis. 2d 216, 223, 544 N.W.2d 423 (1996)).

the right to remain silent." *See id.* (quoting *Davis*, 512 U.S. at 459 (citation omitted)). If the suspect does not unambiguously invoke his or her right to remain silent, the police need not cease their questioning of the suspect. *See Ross*, 203 Wis. 2d at 78.[8]

¶ 29. *Voluntariness.* A statement is not involuntary in violation of the defendant's Fifth Amendment

---

[8] We do not discuss *State v. Goetsch*, 186 Wis. 2d 1, 519 N.W.2d 634 (Ct. App. 1994), in the relevant law section but address it in footnote in order to answer concerns about the relevance of this case to Markwardt's case. The State expresses concern that the circuit court may have sub silentio relied on *Goetsch*. In *Goetsch*, the defendant said, "I don't want to talk about this anymore. I've told you, I've told you everything I can tell you." *Id.* at 7. We concluded that this statement was an invocation of Goetsch's right to remain silent. We also noted in a footnote that:

> We need not decide whether, upon an equivocal assertion of a suspect's right to silence, interrogation must cease. In this case we conclude that any ambiguity in Goetsch's invocation of his right to silence was resolved when the entire interrogation is considered.

*Id.* at 8 n.2.

The State asserts that "[i]nsofar as *Goetsch* suggests that there are some circumstances in which a reviewing court must consider the totality of an interrogation in order to decide whether an otherwise ambiguous statement was intended as the exercise of one's right to silence, *Goetsch* did not survive *Ross*."

We do not agree with the State because we consider the statement in *Goetsch*—"I don't want to talk about this anymore. I've told you, I've told you everything I can tell you"—to be an unequivocal invocation of the right to remain silent. Goetsch was not ambiguous; he explicitly said he did not want to talk anymore. Those are not the facts here. Here, Markwardt makes statements that reasonably could be interpreted in different ways and, therefore, are ambiguous.

rights unless the statement was obtained by coercive police activity. *State v. Owen*, 202 Wis. 2d 620, 641–42, 551 N.W.2d 50 (Ct. App. 1996). This inquiry focuses on whether the police used actual coercion or improper police practices to compel the statement. *Id.* at 642. If the defendant fails to establish that the police used actual coercive or improper pressures to compel the statement, the inquiry ends. *Id.* However, if the defendant establishes coercive conduct, the court must undertake a balancing analysis, weighing the personal characteristics of the defendant against the coercive police conduct, to determine whether the statement was voluntary. *Id.*

¶ 30. *Standard of Review.* Whether a person sufficiently invoked his or her right to remain silent and whether a statement is voluntary are questions of constitutional fact and are reviewed under a two-part standard. *State v. Jennings*, 2002 WI 44, ¶ 20, 252 Wis. 2d 228, 647 N.W.2d 142, and *State v. Moats*, 156 Wis. 2d 74, 94, 457 N.W.2d 299 (1990). First, we must uphold the trial court's findings of historical or evidentiary fact unless they are clearly erroneous. *Jennings*, 252 Wis. 2d 228, ¶ 20, and Wis. Stat. § 805.17(2). Second, we independently review the trial court's application of constitutional principles to those facts. *Jennings*, 252 Wis. 2d 228, ¶ 20, and *State v. Hoppe*, 2003 WI 43, ¶ 34, 261 Wis. 2d 294, 661 N.W.2d 407.

## Discussion

¶ 31. On appeal, the State argues that Markwardt never unequivocally invoked her right to remain silent during her interview with Clark and that none of Markwardt's statements to Clark were involuntary.

Markwardt counters that the State has waived the right to argue that her invocation of her right to remain silent was equivocal and further argues that she unequivocally invoked her right to remain silent and that her statements to Clark were involuntarily made.

¶ 32. We agree with the State that Markwardt did not unequivocally invoke her right to remain silent and that her statements were not involuntary. We begin by addressing Markwardt's arguments to the contrary.

¶ 33. First, we dispose of Markwardt's waiver argument. Markwardt argues that because the State did not cite *Davis* and *Ross* to the circuit court, we should treat the State's claim—that Markwardt made an equivocal assertion of her *Miranda* rights—as an argument raised for the first time on appeal and, as such, we should apply the waiver rule against the State. We do not agree. The State's argument that Markwardt made an equivocal assertion was made to the circuit court, specifically the State argued: "Comments made by [Markwardt] that she wants to go home [are] not a clear [invocation] of her constitutional right to silence . . . [s]he never . . . unequivocally [invokes] her *Miranda* rights." The State's citation for the first time on appeal to *Davis* and *Ross* is not a new argument; it is simply citation to additional authority. Citation to additional authority and legal analysis on appeal does not constitute "new argument" or advancement of a new theory on appeal. *See City of Oshkosh v. Winkler*, 206 Wis. 2d 538, 547, 557 N.W.2d 464 (Ct. App. 1996) (Where we refused to apply waiver when a party gave only a scant argument to the trial court on a particular theory, but provided case authority and detailed analysis for this theory on appeal). The trial court was not blindsided by the State on appeal as Markwardt sug-

gests. Even the short argument given by the State gave the trial court some idea of the State's position. *See id.* at 548. If the court had not been comfortable making a ruling because of the limited depth of the State's analysis, it could have simply requested further briefing. *See id.*

¶ 34. That determined, we proceed to the issues of silence and voluntariness. As noted in our recitation of the relevant law, Markwardt's right to remain silent includes two separate protections: the right, prior to questioning to remain silent unless she chooses to speak in the unfettered exercise of her own will, *see Miranda*, 384 U.S. at 460, and the right to cut off questioning, *see Mosley*, 423 U.S. at 103. The facts demonstrate, and Markwardt has not disputed, that she initially waived her *Miranda* rights. Also, Markwardt does not claim that her waiver was invalid. Therefore, the only component of the right to remain silent at issue is the right to cut off questioning during a police interview following an initial waiver.

¶ 35. The circuit court relied on statements Markwardt made one hour and eleven minutes into the interview for its ruling that she had properly asserted her right to remain silent. Her exact words were: "Then put me in jail. Just get me out of here. I don't want to sit here anymore, alright. I've been through enough today." The circuit court cited no case law to support its conclusion that Markwardt's comments were an unequivocal invocation of her right to remain silent. In fact, because the parties' circuit court briefs failed to set forth the controlling law, it is questionable whether the circuit court took into account the rule of *Ross*, which established that an invocation of the right to remain silent must be unequivocal and unambiguous to be effective.

¶ 36. Under the rule established in *Ross*, a suspect's claimed unequivocal invocation of the right to remain silent must be patent. *See Ross*, 203 Wis. 2d at 75–79. The *Ross* rule allows no room for an assertion that permits even the possibility of reasonable competing inferences: there is no invocation of the right to remain silent if *any* reasonable competing inference can be drawn. *See id.* Accordingly, an assertion that permits reasonable competing inferences demonstrates that a suspect did not sufficiently invoke the right to remain silent. *See id.* We therefore reverse the circuit court because Markwardt's comments permit reasonable competing inferences. A reasonable interpretation of Markwardt's comments could be that she was invoking her right to remain silent. However, an equally reasonable understanding of her comments could be that she was merely fencing with Clark as he kept repeatedly catching her in either lies or at least differing versions of the events. Markwardt's comments are equivocal as a matter of law because there are reasonable competing inferences to be drawn from them. *See id.* at 78 ("If the suspect does not unambiguously invoke his or her right to remain silent, the police need not cease their questioning of the suspect . . . . The Constitution does not require the police to always ask . . . clarifying questions."). Markwardt did not unequivocally invoke her right to remain silent and Clark was therefore not required to stop the interview. *See id.*

¶ 37. We also reverse the circuit court's ruling that Markwardt's statement was involuntary. In explaining why it held Markwardt's statements to be involuntary, the circuit court said it considered "the totality of the circumstances" and then listed two sets of factors on which its decision was grounded. The first factors the court relied on were circumstances unre-

lated to police conduct—facts which could show that Markwardt was under stress: Markwardt had just witnessed a suicide, had blood on her clothing, she was eighteen and had no prior experience with police interrogation. Also, she was crying and sobbing during the interrogation.

¶ 38. The second set of factors on which the circuit court based its decision covered police conduct: the loud and confrontational tone of the interrogation, the lengthiness of the custody and of the interrogation, the fact that Markwardt was initially handcuffed and placed in a holding cell, and the continuation of the interrogation in, what the court had already deemed, violation of Markwardt's right to remain silent.

¶ 39. After independent review of the record, including the compact disc recording of Clark's interrogation of Markwardt, we hold that there existed no coercive police conduct.

¶ 40. First, we have already established that Markwardt's right to remain silent was not violated and, therefore, Clark's continued questioning after Markwardt's equivocal assertion is not coercive police conduct.

¶ 41. Second, in suppressing Markwardt's statements, the circuit court relied in part on its determination that "[t]he tone of the interrogation was loud and confrontational." In *Owen*, 202 Wis. 2d at 642, we rejected Owen's claim that aspects of his interrogation, including the confrontational manner and raised voice of an investigator, were coercive police practices:

> Owen asserts that ... the confrontational manner of [the officer's] interrogation render[s] the statement inadmissible. We disagree .... [The officer's] accusa-

tion that Owen was lying and that he was responsible for Joseph's death are not improper police procedures. Further, the fact that the investigator raised his voice and invaded Owen's space by getting close to him does not establish actual coercion.

¶ 42. Under *Owen,* the fact that Clark was at times[9] confrontational and raised his voice is not improper police procedure and does not, by itself, establish police coercion. *See id.*

¶ 43. Third, the circuit court suggested as significant to its decision that "[t]he custody and interrogation were lengthy." The court found that Markwardt "was in custody commencing at about 3:00 p.m." However, the circuit court made no finding with regard to the length of time Markwardt was in police custody and Markwardt and the State agree that Markwardt was not in custody the entire time she was with the police. Shaw testified that he "told her specifically she was not under arrest" and, at the outset of her interrogation with Clark, Markwardt informed Clark that she had been told that she was not in custody.

¶ 44. Additionally, although Markwardt was questioned for two hours, the questioning was not continuous but was punctuated by two breaks. The first break was at approximately one hour into the interrogation, during which Markwardt was left alone to write her statement. The second break was approximately two hours into questioning and at this time Markwardt was left alone to finish writing her statement and was also taken out for a cigarette break.

---

[9] For accuracy, we note that Clark's interrogation of Markwardt lasted just over two hours and only a small portion of the interview was actually confrontational or loud.

¶ 45. Neither Markwardt's length of custody nor her two-hour interrogation qualifies as coercive or improper police conduct. In *State v. Turner*, 136 Wis. 2d 333, 337–40, 401 N.W.2d 827 (1987), Turner was arrested, held and questioned several times over the course of two days. The length of Turner's detention was approximately thirty-six hours. During this time, Turner was questioned for a total of twelve and one-half hours. *Id.* at 360. The supreme court noted that the interrogation sessions were bracketed by attention to Turner's personal needs. *Id.* at 364. It held that Turner's confession was voluntary and that neither the length of the interrogation nor the length of the detention was "inherently coercive." *Id.* at 362–63. Significantly, in its voluntariness analysis, the supreme court declined to adopt a rule that custody and/or interrogation of a given length is inherently coercive. *Id.* at 362, 364.

¶ 46. Like Turner, Markwardt's personal needs were more than attended to: she was given two breaks in the questioning, she was allowed to clean up in the restroom, she was given a soda and allowed to go outside for a cigarette break. Additionally, Markwardt's lengths of custody and of interrogation were both distinctly shorter than Turner's, whose statements were held to be voluntary. Under *Turner*, neither Markwardt's length of custody nor her interrogation qualifies as coercive police conduct.

¶ 47. The final police-conduct factor that the trial court considered relevant was Markwardt's handcuffing and placement in a holding cell. The statements that the trial court ruled involuntary were made during Clark's interrogation which began at 5:40 p.m. However, Markwardt's handcuffs were removed an hour before this interrogation and cuffs were not used on

443

Markwardt again. Markwardt was not handcuffed when Clark introduced himself to her and began the interrogation. Moreover, in *State v. Agnello*, 2004 WI App 2, ¶ 13, 269 Wis. 2d 260, 674 N.W.2d 594, we emphasized that handcuffing, in itself, is not coercive. The defendant in *Agnello* was handcuffed during breaks when officers left the interrogation room, but not during the interrogation sessions themselves. *Id.*

¶ 48. Again, Markwardt's handcuffs were removed almost an hour before Clark met with her for questioning and, unlike Agnello, Markwardt was not handcuffed during breaks. Markwardt was handcuffed at the location of the traffic stop, right after a bullet fired from within the vehicle she was driving had shattered the rear window of the vehicle. At that time, Jackson police were unsure of what role Markwardt may have played in the shooting of Trisha Bergemann and in James Butler's escape from the shooting scene. The fact that Markwardt remained handcuffed for perhaps ninety minutes, during which time she was transported to the police station and kept in a holding cell awaiting questioning, is not improper or coercive.

¶ 49. In short, none of the police conduct, when considered independently, or when considered as a whole, rises to the level of coercive misconduct. Clark did not violate Markwardt's right to remain silent by continuing to question her after an equivocal assertion of her *Miranda* rights and neither the length of custody and interrogation nor the use of handcuffs and a holding cell qualifies as coercive police conduct.

¶ 50. As such, it is improper to consider Markwardt's personal characteristics because consideration of Markwardt's personal characteristics is triggered *only* if there exists coercive police conduct against which to balance them. *See State v. Clappes*, 136 Wis. 2d

222, 239, 401 N.W.2d 759 (1987) (A defendant's personal characteristics "only become determinative in the voluntariness analysis when there is something against which to balance them."). Here, we do not reach the balancing test because there is no coercive police conduct against which to balance Markwardt's personal characteristics.

## Conclusion

¶ 51. We conclude that all of Markwardt's statements to Clark are admissible because she never unequivocally invoked her right to remain silent and her statements were not involuntary. We additionally do not hold the State to waiver because it did not present a new issue on appeal.

*By the Court.*—Order reversed and cause remanded with directions.