# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1148

_____

Oakdale Mall Associates, a Minnesota Limited Partnership

*Plaintiff - Appellant*

v.

Cincinnati Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 17, 2012
Filed: January 10, 2013

_____

Before RILEY, Chief Judge, COLLOTON and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

Oakdale Mall Associates (Oakdale), a Minnesota limited partnership, and Cincinnati Insurance Company (Cincinnati), an Ohio corporation, dispute whether the commercial property insurance policy Oakdale purchased from Cincinnati covers a loss Oakdale suffered on August 4, 2009. On cross-motions for summary judgment

regarding coverage, the district court[1] denied Oakdale's motion for summary judgment and granted judgment to Cincinnati, concluding the policy excluded Oakdale's damages. Oakdale appeals, and we affirm.

## I.    BACKGROUND

Oakdale owned and operated the Oakdale Mall, a commercial shopping center in Oakdale, Minnesota. Oakdale purchased a commercial property insurance policy from Cincinnati covering direct physical loss or damage to the mall, subject to certain terms and exclusions.

On August 4, 2009, an Oakdale employee discovered thieves had stolen the copper coils contained inside eleven rooftop heating, ventilation, and air conditioning units at the mall. Oakdale filed a claim with Cincinnati for $159,000 to replace the units. Cincinnati denied the claim based upon a policy provision that excluded coverage for any damage resulting from vandalism, theft, or attempted theft if the mall were "vacant for more than 60 consecutive days before that loss or damage."

Under the terms of the policy, the mall was deemed vacant "unless at least 31% of its total square footage [was]:

1) Rented to a lessee or sub-lessee and used by them to conduct their customary operations; or

2) Used by the building owner to conduct customary operations.

The mall had a total area of 180,000 sq. ft., meaning at least 55,800 sq. ft. of the mall had to be occupied for coverage to apply.

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

The parties agree that, at the relevant time, the mall had at least four tenants occupying a total of 18,715 sq. ft.: Deb Shops of Minnesota, Inc. (8,515 sq. ft.); Animal Emergency Clinic, P.A. (3,700 sq. ft.); Bridal Center, Inc. (4,000 sq. ft.); and Wellspring Chiropractic, Ltd. (2,500 sq. ft.). Oakdale maintained it had two additional qualifying tenants: China House Chinese Cuisine (China House) (2,000 sq. ft.) and My Dog Gone Daycare (Dog Gone) (1,931 sq. ft.). Cincinnati challenged the inclusion of those tenants for occupancy because, although both may still have been nominal tenants, neither had been using their leased space to conduct operations for more than a year before the loss.

The parties also disputed the size of the mall's office space and the size of the mall's common areas, both of which constituted space used by Oakdale to conduct its customary operations under the policy. Oakdale contended the mall's office occupied 1,500 sq. ft. and that common areas occupied at least 34,595 sq. ft. Oakdale also argued one of its former tenants, Globe College, during its tenancy, had expanded the common area of the mall beyond 34,595 sq. ft. by erecting additional hallways and common areas in its leased space. Lastly, Oakdale suggested the space for which Oakdale was actively seeking tenants should qualify as occupied space.

Cincinnati calculated the management office at 1,000 sq. ft. and the common area at 25,530 sq. ft. In denying Oakdale's claim, Cincinnati based its calculations on a March 2009 appraisal and rent rolls Oakdale used for other purposes, rather than the information Oakdale provided in filing its claim. Having determined the mall was not 31% occupied at the time of the loss, Cincinnati denied coverage.

On March 22, 2011, Cincinnati sought declaratory relief in the United States District Court for the District of Minnesota. On April 14, 2011, Oakdale sued Cincinnati in Missouri state court, alleging breach of contract and seeking costs and attorney fees under Minnesota law. The District Court for the District of Minnesota denied Oakdale's motion to dismiss or stay Cincinnati's declaratory judgment action.

Cincinnati removed Oakdale's suit to the United States District Court for the Western District of Missouri, which transferred the case to the District of Minnesota. The District Court for the District of Minnesota then denied Oakdale's renewed motion to dismiss and consolidated the cases.

On cross-motions for summary judgment, the district court denied Oakdale's motion and granted Cincinnati's motion, concluding the mall was vacant as a matter of law. Examining the vacancy provision, the district court determined China House and Dog Gone should not be included in the tenant occupied square footage because neither was conducting "customary operations" at the time of the loss. The district court also rejected Oakdale's contentions that the mall was not vacant because (1) China House and Dog Gone still had lease obligations, and (2) Oakdale was trying to lease the vacant space. The district court found Oakdale's interpretation of the policy would render the vacancy provision meaningless.

Starting with a tenant occupied space of 18,715 sq. ft., the district court added the square footage Oakdale provided during summary judgment for office space (1,500 sq. ft.) and common area (34,595 sq. ft.) for a total of 54,810 sq. ft. of occupied space. Because that total was only 30.45% of the mall's total square footage (180,000 sq. ft.), the district court determined the mall was vacant under the terms of the policy.

On January 12, 2012, Oakdale sought relief from the judgment, arguing the district court miscalculated the common area because it ignored the additional hallways added by Globe College. The district court denied Oakdale's post-trial motions, and Oakdale appeals.

## II. DISCUSSION

### A. Standard of Review

We review de novo "the district court's interpretation of the terms of the insurance policy and its" summary judgment decisions. Corn Plus Coop. v. Cont'l Cas. Co., 516 F.3d 674, 678 (8th Cir. 2008). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Minnesota Law

In light of the absence of a valid choice-of-law provision in the policy, see Allianz Ins. Co. of Canada v. Sanftleben, 454 F.3d 853, 855 (8th Cir. 2006) (citing Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980)), and the lack of any conflict in the law of the contact states, see Platte Valley Bank v. Tetra Fin. Grp., LLC, 682 F.3d 1078, 1083 (8th Cir. 2012); Hague v. Allstate Ins. Co., 289 N.W.2d 43, 46-47 (Minn. 1978), we apply Minnesota substantive law to this diversity action, see Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). "Under Minnesota law, the insured bears the initial burden of establishing that coverage exists, at which point the insurer then carries the burden of demonstrating that a policy exclusion applies." Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012) (citing Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006)).

"Interpretation of an insurance contract, including whether provisions in a policy are ambiguous, is a legal question subject to de novo review." Latterell v. Progressive N. Ins. Co., 801 N.W.2d 917, 920 (Minn. 2011). "Insurance policy provisions are ambiguous only when they are 'reasonably subject to more than one interpretation.'" Id. (quoting Am. Commerce Ins. Brokers, Inc. v. Minn. Mut. Fire and Cas. Co., 551 N.W.2d 224, 227 (Minn. 1996)). "Ambiguity in a policy will be construed against the insurer, but 'the court has no right to read an ambiguity into the plain language of an insurance policy.'" Friedberg, 691 F.3d at 951 (quoting State Farm Ins. Cos. v. Seefeld, 481 N.W.2d 62, 64 (Minn. 1992)). The courts "must

fastidiously guard against the invitation to create ambiguities where none exist." Latterell, 801 N.W.2d at 921 (quoting Columbia Heights Motors, Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 36 (Minn. 1979)) (internal quotation marks omitted).

"In interpreting the policy language, a court is to give the terms 'their plain, ordinary, and popular meaning.'" Columbia Heights Motors, Inc., 275 N.W.2d at 34 (quoting Ostendorf v. Arrow Ins. Co., 182 N.W.2d 190, 192 (Minn. 1970)). "The policy's language 'should be construed, if possible, so as to give effect to all provisions.'" Friedberg, 691 F.3d at 951 (quoting Bobich v. Oja, 104 N.W.2d 19, 24 (Minn. 1960)).

## C.    Common Area

The vacancy clause in the Cincinnati policy stated the mall would be deemed vacant "unless at least 31% of its total square footage [was]: 1) Rented to a lessee or sub-lessee and used by them to conduct their customary operations; or 2) Used by the building owner to conduct customary operations."  In its briefs supporting its summary judgment motion, Oakdale stated, "34,595 square feet of the mall made up the common area that was open and available to the public.  This area included hallways, corridors, and toilets."  Oakdale further stated, "In total, [Oakdale] was using 36,095 square feet in conducting its customary operations"—1,500 sq. ft. of office space and 34,595 sq. ft. of common area.  Oakdale also provided the district court with detailed occupancy calculations, all of which used 34,595 sq. ft. of common area.

In its reply supporting summary judgment, Oakdale declared, "the appropriate amount of common area at the time the loss occurred was 34,595 square feet." Although Oakdale repeatedly described 34,595 sq. ft. as the total common area and provided the district court with specific calculations based on that figure, Oakdale also generally asserted Globe College added several thousand square feet of hallways "not included in the previous computation." Oakdale argued the areas would increase

-6-

the occupied square footage well beyond 31%, but did not provide any actual measurements or alternative calculations.[2]

In opposing Cincinnati's summary judgment motion, Oakdale again repeatedly referred to 34,595 sq. ft. as the correct amount of common area and provided calculations based on that figure. Oakdale's calculations indicated the 34,595 sq. ft. of common area included the common hallways maintained by Globe College. Oakdale again vaguely referred to thousands of feet of additional hallways not included in its calculations that put the mall "well above the occupancy requirement," but did not provide any actual square footage or alternative calculations.

Based on the figures Oakdale provided, the district court determined "[e]ven using Oakdale's calculations for common space and office space, Oakdale has failed to establish that the mall was at least 31% occupied at the time of the theft at issue." Oakdale claims this was error because the district court failed to include the "additional hallways of unspecified size" in the former Globe College space. We disagree.

While a disagreement about the size of any additional hallways and the total common area could create a genuine dispute of material fact under different circumstances,[3] we conclude the district court was entitled to rely on Oakdale's

_____

[2]On appeal, for the first time, Oakdale asserts "those additional hallways erected by Globe College . . . measured approximately 2,293 feet," raising the occupancy to 31.7% and putting "Oakdale in a position where it meets the insurance policy's occupancy requirements." Oakdale's self-described "illustrative" measurements are not part of the record on appeal, and we must not consider them. See Fed. R. App. P. 10(a); McNamara v. Yellow Transp., Inc., 570 F.3d 950, 955 (8th Cir. 2009).

[3]In reviewing the record, we suspect Oakdale's recent assertion—the Globe College hallways added thousands of additional common area square

specific calculations and repeated statements that the total common area was 34,595 sq. ft.  See Delapaz v. Richardson, 634 F.3d 895, 899-90 (7th Cir. 2011) (rejecting plaintiffs' claimed error based upon conflicting paragraphs in their summary judgment response because the district court could rely on the plaintiffs' admissions).

Oakdale vaguely referred to the "bonus hallways" in its briefs, but never provided a sufficient basis to support a different calculation than the one Oakdale repeatedly urged the district court to use.  "It was not the District Court's responsibility to sift through the record to see if, perhaps, there was an issue of fact." Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009). The district court did not err in accepting Oakdale's specific calculations of common area and deciding they were insufficient to allow a reasonable jury to find the vacancy provision was met.

### D.    Space Oakdale Sought to Lease

Oakdale faults the district court for failing to include in its calculation of the mall's "[o]ccupied space . . . that space for which Oakdale was actively seeking tenants."  Oakdale contends "[t]he language of the policy should be interpreted, with regard to a shopping center, to define 'vacancy' as a shopping center that has no tenants and is not seeking new tenants."  In Oakdale's view, by posting "a large sign outside the mall advertising available space for rent" and "seeking out new tenants, [Oakdale] was using the property to conduct normal business operations" in satisfaction of the vacancy provision.

We agree with the district court that Oakdale's interpretation of the policy "would render the vacancy clause of the policy meaningless."  The primary purpose of the vacancy provision is to reduce the risk of loss by requiring a physical presence

---

footage—results from a double counting of those areas and already is included in the 34,595 sq. ft. of common area calculation.

at the property to help secure the property from vandals and thieves. Under Oakdale's interpretation of the policy—"[a] shopping center may not be 'vacant' if the owner is trying to rent the space"—the mall could be completely vacant, but would be deemed fully occupied for purposes of the vacancy provision if the owner simply posted a sign outside or placed an advertisement online or in the newspaper. Oakdale's interpretation is unreasonable, bordering on the absurd.

### E.  Space Under Lease to China House and Dog Gone

Oakdale next proposes the district court erred in excluding space once occupied by China House and Dog Gone from the mall's occupancy calculations because China House had a valid lease and Dog Gone was a tenant at will, both with rights to use their respective spaces. Oakdale acknowledges China House stopped doing business at the mall and was not using the space to conduct its customary operations, but argues China House still had a valid lease and had not notified Oakdale it had stopped using or otherwise surrendered the premises at the time of the theft. According to Oakdale, because China House still had a lease and the right to occupy the property, "Oakdale was very clearly using the China House space as part of [Oakdale's] customary business operations"—leasing mall space to tenants.

With respect to Dog Gone, Oakdale maintains it was "irrelevant whether Dog Gone was using the premises as part of its customary business operations because Oakdale was." Oakdale asserts the lack of a definition of "customary operations" in the policy means the phrase is ambiguous and can be interpreted "any number of ways" when applied to a mall, including an interpretation that would encompass Oakdale simply leasing the property.

We again reject Oakdale's strained interpretation of the policy. Not only is Oakdale's interpretation contrary to the purpose of the vacancy provision, it also creates a conflict between the first and second clauses of that provision. The first clause has two parts: (1) the space be rented to a lessee or sub-lessee, and (2) the

space be "used by them to conduct their customary operations." The second clause includes the space used in Oakdale's customary operations as occupied.

Oakdale's interpretation of the second clause—a valid lease satisfies the vacancy provision because leasing space is Oakdale's customary operation—would render the requirements in the first clause—the space be both rented and used by the tenant to be occupied—without effect. Oakdale's interpretation of the vacancy provision is unreasonable, and the district court did not err in rejecting it. See Mut. Serv. Cas. Ins. Co. v. Wilson Twp., 603 N.W.2d 151, 153 (Minn. Ct. App. 1999) ("If a phrase is subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control and no ambiguity exists."); see also Noran Neurological Clinic, P.A. v. Travelers Indem. Co., 229 F.3d 707, 709 (8th Cir. 2000) (explaining, under Minnesota law, the reasonable construction of a policy controls over an unreasonable interpretation).

## III. CONCLUSION

We affirm.

_____