COURT OF APPEALS
DECISION
DATED AND FILED

November 26, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2023AP1841**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021CV1373

**IN COURT OF APPEALS
DISTRICT III**

---

FRANKENTHAL INTERNATIONAL, LTD AND
FRANKENTHAL BUILDING, LLC,

   PLAINTIFFS-RESPONDENTS,

 V.

WEST BEND MUTUAL INSURANCE COMPANY,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Brown County: JOHN P. ZAKOWSKI, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1    HRUZ, J. West Bend Mutual Insurance Company appeals a stipulated judgment, which followed a grant of partial summary judgment in favor of Frankenthal International, LTD, and Frankenthal Building, LLC (collectively, "Frankenthal"), and a denial of summary judgment to West Bend. The circuit court

concluded that West Bend's property insurance policy covered water damage to a building that Frankenthal owned. In reaching this conclusion, the court determined that the building was not "vacant," as that term is defined in West Bend's policy, because it was being used for Frankenthal's "customary operations" at the time of the water damage. West Bend argues that the court erroneously interpreted the vacancy provision by determining that Frankenthal's "customary operations" included Frankenthal's ongoing, active efforts to lease space in its building.

¶2      We conclude that the term "customary operations," as used in the vacancy provision in West Bend's policy, is susceptible to more than one reasonable interpretation and is therefore ambiguous. For this reason, we construe the policy in favor of coverage for Frankenthal and conclude that, based on the undisputed facts in this case, Frankenthal's "customary operations" under West Bend's policy included Frankenthal's ongoing, active efforts to lease space in its building. Accordingly, we affirm.

## BACKGROUND

¶3      The relevant facts are undisputed. Frankenthal owns real property located at 124 North Adams Street ("the 124 Adams Property"), 130 North Adams Street ("the 130 Adams Property"), and 306-308 Cherry Street ("the Cherry Property") in downtown Green Bay, Wisconsin. These three properties are all contained within a single building—the Frankenthal Building—which Frankenthal owns. Frankenthal insured these three properties through an insurance policy issued by West Bend ("the Policy"), which was in effect from June 1, 2020, through June 1, 2021.

¶4      The three properties at issue are listed as two locations in the Policy's declarations page. Location one consists of the 124 Adams Property, which the

Policy describes as "Office" and "Offices-Non-Governmental." Location two consists of the 130 Adams Property and the Cherry Property. The Policy describes that location as "Office" and "Mercantile–Multiple Occupancy–over 15,000 sq. ft." The 124 Adams Property and the Cherry Property were last occupied by tenants in 2009 and 2013, respectively.

¶5      The 130 Adams Property was last rented by Wells Fargo Bank, N.A., from January 2, 2015, until May 30 or 31, 2020. Although its lease ended in May 2020, Wells Fargo had moved out of the 130 Adams Property in February 2020. When Wells Fargo moved out of the property, it left various pieces of its furniture behind, including office desks and chairs, conference room tables and chairs, lobby chairs, cubicle partitions, and file cabinets.

¶6      Frankenthal retained Wells Fargo's furniture to keep the 130 Adams Property furnished for potential new tenants. On March 4, 2020, Frankenthal showed that property to a potential new tenant, who gave a "strong indication of interest but needed to take the information back to [its] Board Members for approval."[1] Frankenthal also employed a property manager, Steve Van Handel, who visited the Frankenthal Building once or twice a week to check for maintenance issues.

¶7      On February 19, 2021, Frankenthal received a call from a pedestrian who was walking by the Frankenthal Building. The individual informed Frankenthal that "he heard what sounded like a waterfall and then saw water coming from the [building's] masonry." At some point between February 18 and 19, 2021, some of the building's pipes froze and burst, causing water damage to the three

---

[1] Ultimately, this potential new tenant did not rent the 130 Adams Property, given that the property remained ready for occupancy when the loss occurred.

properties. The pipes froze and burst because of a furnace malfunction, which resulted in the building losing heat. The reason for the furnace malfunction is unknown, but the parties have not asserted that it is material to this appeal.

¶8      Van Handel believed he had last visited the Frankenthal Building on either February 16 or 17, 2021, to inspect the building for any potential issues. At that time, he did not see anything that required maintenance and he did not notice any water leakage. When the water damage occurred, the 130 Adams Property still contained Wells Fargo's furniture. No furniture was located in the 124 Adams Property and the Cherry Property.

¶9      On the same day that Frankenthal discovered the water damage, it filed a claim with West Bend. On February 22, 2021, Bradley Kohl, West Bend's adjuster for this claim, inspected the damaged properties. West Bend later denied Frankenthal's claim.

¶10     Frankenthal eventually sued West Bend, alleging that West Bend had breached the Policy by denying Frankenthal's claim and that West Bend breached its statutory obligation to pay the "amounts due to its insureds in a proper and timely fashion" pursuant to WIS. STAT. § 628.46(1) (2021-22).[2] West Bend raised the Policy's vacancy provision—the one at issue in this appeal—as one of its affirmative defenses. That provision—located in the section of the Policy titled "Building and Personal Property Coverage Form" under Paragraph E—is titled "Loss Conditions." The provision reads, in relevant part:

> When this policy is issued to the owner or general lessee of a building, building means the entire building. Such

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

building is vacant unless at least 31% of its total square footage is:

(i)     Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii)    Used by the building owner to conduct customary operations.

(Formatting altered.) Further, a building "under construction or renovation [is] not considered vacant."

¶11    The provision then states that "[i]f the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs," then West Bend "will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss." The list that follows includes water damage as an excluded cause.

¶12    West Bend moved for summary judgment, arguing that the water damage was not covered by the Policy because the Frankenthal Building had been vacant for more than sixty consecutive days before the loss occurred. Frankenthal opposed West Bend's motion and moved for partial summary judgment on the issue of coverage. Among other things, Frankenthal argued that: (1) the Frankenthal Building was not vacant under the Policy; (2) West Bend had waived or was estopped from invoking the Policy's vacancy provision as a defense because it had paid a vandalism claim in June 2020, despite knowing that the building had no tenants;[3] and (3) concurrent causes created the loss, and the Policy covered the loss under the concurrent cause doctrine.

---

[3] Vandalism is also an excluded cause in the Policy's vacancy provision.

¶13    The circuit court held a hearing on the summary judgment motions, which was followed by supplemental briefing from the parties. The court then issued a written decision, granting Frankenthal's partial summary judgment motion and denying West Bend's motion. Relying on *Myers v. Merrimack Mutual Fire Insurance Co.*, 788 F.2d 468 (7th Cir. 1986), a case that both parties referenced in their summary judgment briefing, the court concluded that the Frankenthal Building was not vacant under the Policy.[4]

¶14    In *Myers*, the property owner bought a fully occupied apartment building in central Illinois in 1977. *Id.* at 469. By 1981, the building had no tenants and the owner began renovating it. *Id.* The renovation, however, proceeded slowly because the owner's job required him to always be on call and because the owner was building his own home in Missouri. *Id.* at 469-70. As a result, the owner was present at the building and worked on its renovation only about once a month. *Id.* at 470. During the renovation period, the building was "deserted and unsecured," had no water or electricity, and its units were empty, except for some stoves and refrigerators. *Id.* Furthermore, there were several doors in the building that did not have locks. *Id.* Approximately two years into the renovation, a fire damaged the building. *Id.* at 469. After noting the differences between the terms "vacant" and "unoccupied," the United States Court of Appeals for the Seventh Circuit ultimately concluded that the building was vacant, and not merely unoccupied, because the building's units "were entirely empty for approximately eighteen months, lacking both tenants and inanimate objects." *Id.* at 471-72.

---

[4] The circuit court also concluded that West Bend had not waived its right to invoke the Policy's vacancy provision as a defense to Frankenthal's claim nor was it estopped from doing so. The court did not address Frankenthal's concurrent cause argument.

¶15 The circuit court, here, extensively compared the circumstances in *Myers* to the undisputed facts in this case. It found that several factors that were absent in *Myers* were present in this case, which militated in favor of finding that the Frankenthal Building was merely unoccupied, but not vacant, at the time of the water damage. In particular, the court noted: Frankenthal was in the business of owning and leasing property; a tenant had occupied the 130 Adams Property until February 2020; and that property had remained tenantless after February 2020 because "demand for professional office space plummeted due to government-mandated shutdowns and corporate decisions to allow (or require) employees to work from home, both in response to the pandemic." For these reasons, the court believed that the Frankenthal Building's tenantless status was qualitatively different from that of the building in *Myers*.

¶16 Furthermore, the circuit court noted Frankenthal's actions taken to keep the Frankenthal Building in an immediately leasable position, which distinguished its efforts from those of the insured in *Myers*, "who did not appear to be looking for tenants to fill any available space or to fill the building once the renovation was completed." These actions included keeping Wells Fargo's furniture, which Frankenthal did precisely "to entice prospective tenants." Other factors that the court considered important in this regard were: Van Handel's consistent maintenance inspections of the Frankenthal Building and his presence in the building one or two days prior to the loss; the maintenance of building security because of concerns with "on-going rioting, vandalism, metal thefts, and squatting"; the property still having operating utilities; and the fact that the Frankenthal Building was not an "orphaned property on the edge of town where, if there was no property manager, it would take days and days for anyone to notice a situation." The court thus found that Frankenthal's efforts to actively seek prospective tenants

7

were consistent with its customary operations of leasing space in the Frankenthal Building, despite the delay in those efforts being successful.

¶17  Taken together, the circuit court found that the foregoing circumstances, which were not present in *Myers*, showed that Frankenthal was using the Frankenthal Building to conduct the customary operations "of a true landlord." Because "at least 31% of [the Frankenthal Building's] total square footage [was] … [u]sed by the building owner to conduct customary operations," the court concluded that it was not "vacant" at the time of loss. Accordingly, the court granted partial summary judgment to Frankenthal on the issue of coverage and denied West Bend's motion for summary judgment.

¶18  With only the issue of damages remaining, Frankenthal and West Bend stipulated to a final order and judgment in favor of Frankenthal and against West Bend for $512,200, plus postjudgment interest, and costs in the amount of $840.50. Thereafter, the circuit court entered its final order and judgment for the stipulated amount. West Bend now appeals.

## DISCUSSION

¶19  We review summary judgment decisions de novo, applying the same methodology as the circuit court. *Maxwell v. Hartford Union High Sch. Dist.*, 2012 WI 58, ¶26, 341 Wis. 2d 238, 814 N.W.2d 484. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). Here, the circuit court's summary judgment decision turned on the interpretation of the Policy and, more specifically, on the term "customary operations" in the Policy's vacancy provision. The

interpretation of an insurance policy is a question of law that we review de novo. *American Fam. Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶23, 268 Wis. 2d 16, 673 N.W.2d 65.

¶20    We use a three-step procedure for interpreting insurance policies. *Id.*, ¶24.  We first "examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." *Id.*  If the policy clearly did not intend to cover the insured's asserted claim, we end the analysis there. *Id.*  If the policy provides an initial grant of coverage, we next examine the policy's exclusions to determine whether any of them preclude coverage of the insured's claim. *Id.*  "Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain."[5] *Id.*  If an exclusion applies, we then determine "whether any exception to that exclusion reinstates coverage." *Id.*

¶21    The vacancy provision at issue here states, in relevant part, that when the Policy is issued to an owner or a general lessee of a building—here, Frankenthal—that building is vacant "unless at least 31% of its total square footage

---

[5]  In the circuit court, West Bend conceded that the Policy made an initial grant of coverage and argued the vacancy provision as an exclusion to coverage.  Neither West Bend nor Frankenthal addressed this concession in their appellate briefs, but we asked about it at oral argument—which we held on September 5, 2024, in Green Bay, Wisconsin—for purposes of interpreting the Policy. West Bend maintained that the vacancy provision is an exclusion to coverage.  Frankenthal agreed that there was an initial grant of coverage but that the vacancy provision was a condition of that coverage.  The parties also referenced *Waterstone Bank, SSB v. American Family Mutual Insurance Co.*, 2013 WI App 60, 348 Wis. 2d 213, 832 N.W.2d 152, in answering whether the vacancy provision is an exclusion, versus a condition of coverage within the initial coverage grant. We note, however, that the parties largely did so for purposes of their respective waiver/estoppel and concurrent cause arguments, which we do not address.

Ultimately, we need not decide which type of provision the vacancy provision is.  While its status as an exclusion to coverage would require us to construe it narrowly or strictly, we would find the provision ambiguous—and therefore construe it in favor of Frankenthal—even when interpreting it as part of the initial grant of coverage. *See Folkman v. Quamme*, 2003 WI 116, ¶13, 264 Wis. 2d 617, 665 N.W.2d 857 ("If there is an ambiguous clause in an insurance policy, we will construe that clause in favor of the insured.").

is:" "(i) [r]ented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or (ii) [u]sed by the building owner to conduct customary operations." The Policy does not define "customary operations," and no Wisconsin appellate court appears to have previously interpreted the term in this context. Thus, we apply the rules of construction used in contract interpretation to interpret the term "customary operations" in the Policy. *See* ***Secura Supreme Ins. Co. v. Estate of Huck***, 2023 WI 21, ¶12, 406 Wis. 2d 297, 986 N.W.2d 810.

¶22     When interpreting insurance policies, we seek to determine and give effect to the contracting parties' intent. ***American Girl***, 268 Wis. 2d 16, ¶23. We construe a policy according to its plain and ordinary meaning as it would be understood by a reasonable insured, ***Preisler v. General Cas. Ins. Co.***, 2014 WI 135, ¶18, 360 Wis. 2d 129, 857 N.W.2d 136, but we do not interpret policies "to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium," ***American Girl***, 268 Wis. 2d 16, ¶23. If possible, we should interpret policy language "so that all parts are given meaning." ***Secura***, 406 Wis. 2d 297, ¶12 (citation omitted).

¶23     "Policy language is ambiguous when a reasonable insured would read the policy to provide coverage and the language is susceptible to more than one reasonable interpretation." ***Preisler***, 360 Wis. 2d 129, ¶20. Policy language "may be inherently ambiguous or may be ambiguous when considered in the context of the insurance policy as a whole." ***Frost ex rel. Anderson v. Whitbeck***, 2002 WI 129, ¶18, 257 Wis. 2d 80, 654 N.W.2d 225. If such language is ambiguous, the ambiguities are construed against the insurer and in favor of coverage. ***Id.***, ¶19.

¶24    Both West Bend and Frankenthal agree that Frankenthal is in the business of leasing space in the Frankenthal Building. Also, at oral argument, both parties agreed that, based on the record in this case, there is no dispute that Frankenthal was attempting to lease space in the Frankenthal Building. West Bend argues, however, that those efforts to lease space in the building are not part of Frankenthal's customary operations, while Frankenthal contends that they are.

¶25    At the outset, we reach certain conclusions that underlie our analysis going forward. First, while we agree with and appreciate the general distinction that Frankenthal advances between properties that are "unoccupied" versus those that are "vacant," our focus must be on the actual language in the Policy's relevant vacancy provision. That is to say, did Frankenthal use at least 31% of the Frankenthal Building for its "customary operations"?[6]

¶26    Second, we categorically reject certain notions that West Bend advances for why a building owner's active attempts to find tenants are not part of its "customary operations." It is myopic to contend that such active, ongoing conduct is not a customary operation merely because the owner yields a monetary return from "its business" only by actually renting units. Likewise, for purposes of understanding the meaning of a building owner's customary operations, we are unmoved by either the Policy's inclusion of a sixty-day "grace period" once vacancy is established per its terms or by the potential for a property owner to otherwise

---

[6] The "31% of the total square footage" requirement of the vacancy provision is not at issue here. At oral argument, Frankenthal's position was that the Frankenthal Building either satisfied the 31% requirement or West Bend failed to raise, in its denial of coverage, the issue of whether the total percentage was met. West Bend agreed that it had not raised the "total percentage" issue in the circuit court and that its position—both in the circuit court and now on appeal—was that Frankenthal used no percentage of the Frankenthal Building for its customary operations. Accordingly, the only issue is whether the property was vacant, not whether it was sufficiently vacant.

insure against losses after that grace period. Again, the question is whether the Frankenthal Building *was* vacant under the Policy's terms at the time of the water damage.

¶27 Returning then to our interpretation of the term "customary operations" in the Policy's vacancy provision, and its application to Frankenthal's claim related to the water damage at issue, we outline the parties' remaining arguments.

¶28 At oral argument, we pressed West Bend on why it believed Frankenthal's efforts to lease space in the Frankenthal Building were not part of its customary operations even though Frankenthal intended to lease that space and evidence showed that it was actively attempting to do so. West Bend responded that Frankenthal was not "using" the Frankenthal Building—i.e., Frankenthal was not doing anything at or with the building—to obtain a lessee. It asserted that conducting showings of the building and having the property manager visit the building once or twice a week were insufficient actions to constitute a use of the building for Frankenthal's customary operations. Indeed, West Bend argued that had there been a leasing office in the Frankenthal Building and had Frankenthal used that office to service its properties in the building, then Frankenthal *would* have been using the building for its customary operations because those actions go beyond simply attempting to lease space in the building and involve a more active use of the building. Beyond the foregoing, West Bend also claimed that Frankenthal was not using the space in the building for the purposes provided in the Policy's declarations page ("office" or "mercantile").

¶29 Conversely, Frankenthal argued that its ongoing efforts to lease space in the Frankenthal Building were part of its customary operations because it

continuously used the building by keeping it furnished, negotiating with prospective tenants to lease space in the building, having its property manager regularly visit the building for maintenance, and maintaining functional utilities and security. As to West Bend's interpretation of customary operations as requiring the actual renting of space in the building and activities incidental to that renting, Frankenthal contended that the Policy fails to explicitly state this requirement. In addition, Frankenthal noted that the "office" and "mercantile" terms used in the declarations page, which West Bend contends are "purposes" for which the building is used, do not describe Frankenthal's own customary operations, but instead merely describe the type of building uses that the Policy insures.

¶30    We also asked West Bend and Frankenthal how a reasonable insured would interpret the Policy's vacancy provision and its purpose. As to the provision's purpose, West Bend argued that a reasonable insured would understand the purpose of the vacancy provision as requiring a "systematic and pervasive" presence that serves as a deterrent to risks such as theft, vandalism, or water damage. Based on this purpose, West Bend contended that a reasonable insured would understand that an entirely empty building without tenants and without a regular presence (or with only a maintenance visit once or twice a week) is a vacant building under the Policy. Further, a reasonable insured would not understand that maintaining a building in a manner where it can be promptly leased is a customary operation because the building is still "not being used." Again, West Bend asserted that Frankenthal would have been using the Frankenthal Building to conduct its customary operations if there had been a leasing office with people in it every day to undertake activities needed to lease the building.

¶31    Frankenthal's overall understanding of the purpose of the Policy's vacancy provision is similar to that of West Bend's. Frankenthal asserted that a

reasonable insured would understand the vacancy provision's purpose as requiring an owner's regular presence at the building to ensure that the building's condition has not deteriorated. Thus, Frankenthal contended that a reasonable insured would understand that the Policy required an owner to "engage in a genuine process" of attempting to lease space in the building, and, if the owner did so, the building would not be vacant. This process includes keeping utilities in operation, maintaining the building, having a property manager visit the building two or three times per week, advertising the space for rent, and negotiating leases with prospective tenants. For both parties, then, an owner's regular presence at the functional building matters in determining how a reasonable insured would interpret the Policy's vacancy provision.

¶32      In addition to their arguments above, both parties contend that their opponent's interpretation of the term "customary operations" would render certain language in the Policy's vacancy provision meaningless—a result that we must avoid, if possible, when construing contracts, including insurance policies. *Secura*, 406 Wis. 2d 297, ¶17; *see also* ***Connors v. Zurich Am. Ins. Co.***, 2015 WI App 89, ¶28, 365 Wis. 2d 528, 872 N.W.2d 109 ("[C]ourts avoid interpreting policy language as though it adds nothing, as if it were 'mere surplusage.'" (citation omitted)).

¶33      West Bend argues that customary operations must include only "actually renting the property and activities incidental to renting the property." Citing ***Oakdale Mall Associates v. Cincinnati Insurance Co.***, 702 F.3d 1119 (8th

Cir. 2013),[7] West Bend contends that the circuit court's interpretation of the term—namely, that efforts to lease space in the building alone are customary operations—would render the Policy's vacancy provision meaningless "because the landlord-insured could take minimal steps to find renters" and thereby avoid having an actually vacant property ever be deemed vacant.

¶34    Frankenthal, for its part, asserts that West Bend's interpretation would essentially have the Policy twice apply the lessee clause of the vacancy provision (i.e., that the building be "[r]ented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations") and render meaningless the owner clause of the provision (i.e., that the building be "[u]sed by the building owner to conduct customary operations"). In other words, West Bend's requirement that a building owner's customary operations include only the actual leasing of space is the same as requiring that the building be rented and used by a lessee or a sublessee to conduct its own customary operations. Frankenthal thus contends that West Bend's interpretation would render the owner clause of the vacancy provision meaningless.

¶35    In *Oakdale Mall*, the United States Court of Appeals for the Eighth Circuit conducted an analysis that can be understood to support both West Bend's and Frankenthal's respective positions. In that case, the owner of a mall filed a claim with its insurer to replace items stolen from the mall. *Oakdale Mall*, 702 F.3d at 1120-21. Similar to the Policy here, the policy in that case deemed the mall vacant

---

[7] West Bend concedes that it did not cite *Oakdale Mall Associates v. Cincinnati Insurance Co.*, 702 F.3d 1119 (8th Cir. 2013), in support of its arguments in the circuit court. Yet, we agree with West Bend that the case addresses issues consistent with those raised by the parties both in the circuit court and now on appeal. *See State v. Markwardt*, 2007 WI App 242, ¶33, 306 Wis. 2d 420, 742 N.W.2d 546 (allowing citations to additional authority on appeal when the circuit court has some idea of a party's position).

unless at least 31% of its total square footage was either: (1) "[r]ented to a lessee or sub-lessee and used by them to conduct their customary operations"; or (2) "[u]sed by the building owner to conduct customary operations." *Id.* at 1121. The parties agreed that the mall had at least four tenants, but the parties disagreed about two other tenants who had not used their space in the mall to conduct their operations for more than a year before the loss. *Id.* As to one of those two tenants, the owner argued that it was using that tenant's space as part of its customary operations because that tenant still had a valid lease and a right to occupy the space, despite the fact that the tenant had stopped doing business at the mall. *Id.* at 1124.

¶36 The Eighth Circuit noted that the owner's interpretation of the vacancy provision created a conflict between the two clauses of the vacancy provision. *Id.* at 1125. By having a valid lease satisfy the clause requiring that the owner use the building to conduct customary operations, the Eighth Circuit concluded that the clause requiring that the tenant rent and use the space to conduct its customary operations would have no effect. *Id.* The Eighth Circuit's conclusion supports Frankenthal's position that West Bend's interpretation of "customary operations" would render the owner clause of the vacancy provision meaningless.

¶37 But the Eighth Circuit also rejected the owner's argument that the mall was not vacant because the owner used the mall to conduct customary operations simply by placing a sign outside of the mall that advertised space for rent and by seeking out new tenants. *Id.* at 1124. The Eighth Circuit determined that the owner's interpretation would mean that "the mall could be completely vacant, but the mall would be deemed fully occupied for purposes of the vacancy provision if the owner simply posted a sign outside or placed an advertisement online or in the newspaper." *Id.* The Eighth Circuit further determined that the owner's interpretation would render the vacancy provision meaningless because the

provision's primary purpose was "to reduce the risk of loss by requiring a physical presence at the property to help secure the property from vandals and thieves." *Id.* The Eighth Circuit's conclusion in this regard supports West Bend's position that Frankenthal's interpretation of "customary operations" would render the Policy's vacancy provision meaningless.[8]

¶38     Given the foregoing considerations, including especially the Policy's language and the agreed-upon purpose of the vacancy provision, we conclude that the term "customary operations" in the Policy is susceptible to more than one reasonable interpretation. Therefore, the term "customary operations" in the Policy, at least as applied to the undisputed facts of this case, is ambiguous. Consequently, we construe that term against West Bend and in favor of coverage for Frankenthal. Because we are to decide cases on the narrowest grounds—here, the existence of ambiguous contract language—we need not definitively decide which interpretation is best, either generally or under the facts of this case. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707.

---

[8] While the parties cite to other non-Wisconsin authorities, none of them are particularly apt, especially when comparing certain facts among the cases. If anything, the disparate focuses and analyses of the question of "vacancy" for purposes of property insurance coverage in those cases tend to support both parties' interpretations of the term "customary operations." *See Icarus Holdings 2, LLC v. AmGUARD Ins. Co.*, 601 F. Supp. 3d 314, 324 (N.D. Ill. 2022) (concluding that customary operations "included work in support of renting the building like maintenance or cleaning, but not holding the property without tenants and listing it for sale"); *Gallo v. Travelers Prop. Cas.*, 801 N.Y.S.2d 849, 851 (App. Div. 2005) (concluding that a building was not vacant "inasmuch as plaintiff had sufficient 'business personal property,' i.e., furnishings, in the three apartments 'to conduct his customary operations' of renting the apartments"); *cf. Peace ex rel. Lerner v. Northwestern Nat'l Ins. Co.*, 228 Wis. 2d 106, 136, 596 N.W.2d 429 (1999) (stating that an insurance policy clause does not become ambiguous because the parties "can point to conflicting interpretations of the clause by different courts. If the existence of differing court interpretations inevitably meant ambiguity, then only the first interpretation by a court would count").

¶39 When read together with the insured properties' descriptions in the Policy's declarations page, a reasonable insured in Frankenthal's position could read its "customary operations" to include the actual leasing of space in the Frankenthal Building and activities incidental to leasing that space, which, as West Bend suggests, include having a leasing office in the building that regularly services its leased properties. The Policy's declarations page uses the terms "Office," "Non-Governmental," and "Mercantile" under the label "Building and Occupancy Description," which a reasonable insured could read to describe the properties' uses. Although those terms may just describe the type of property that is insured, they may also be read to describe the purposes for which those spaces are leased or otherwise used. Because Frankenthal was not using any of the space in the Frankenthal Building for the "purposes" listed in the Policy's declarations page, and it was not engaged in any of the activities incidental to leasing those spaces for those "purposes," Frankenthal was not, in that sense, "using" the Frankenthal Building to conduct its customary operations. Therefore, a reasonable insured in Frankenthal's position could understand that its building would not be covered for the water damage under the Policy due to it being "vacant."

¶40 But West Bend's interpretation of "customary operations" as including only the actual leasing of space in the Frankenthal Building, while not per se unreasonable, would largely subsume the vacancy provision's owner clause into the lessee clause. West Bend's interpretation renders the owner clause without much, if any, effect, given that it requires the same thing as the lessee clause of the vacancy provision (that space be rented to a lessee or sublessee and used to conduct that lessee or sublessee's customary operations). That is, under West Bend's interpretation, both clauses would require actual leasing of space to a tenant.

18

¶41 If, however, a reasonable insured in Frankenthal's position read customary operations to include active efforts to lease space in the Frankenthal Building and to keep the property in a position to promptly lease its space, that interpretation gives meaning to the owner clause of the Policy's vacancy provision. A building owner, such as Frankenthal, which is in the business of leasing space in its building cannot obtain tenants to lease space without actively seeking those tenants. In actively seeking those tenants, a building owner must maintain its building in an immediately leasable form by: keeping utilities in place, having a property manager visit the building one or two times per week, keeping the building furnished, advertising the space for rent, and negotiating with prospective tenants to lease space in the building. Without maintaining a building in rentable form, an owner would be unable to obtain tenants to lease space in its building and, therefore, be unable to engage in its business of leasing space.

¶42 The actions by Frankenthal involved more than simply placing a sign on its building that advertised space for rent or placing an advertisement online or in the newspaper, which the Eighth Circuit in *Oakdale Mall* considered, as a matter of law, insufficient actions to constitute a use of a property owner's building for its customary operations. Furthermore, and importantly, performing such actions fulfills the vacancy provision's purpose of requiring the owner's presence to ensure the building neither deteriorates nor is otherwise damaged. Thus, unlike the owner's interpretation of customary operations in *Oakdale Mall*—which the Eighth Circuit found unreasonable because it rendered meaningless both the vacancy provision and its purpose—here, including an owner's active efforts to lease space as part of its customary operations presents a reasonable interpretation of the term, given that it fulfills the vacancy provision's purpose and gives effect to the provision's owner clause.

19

¶43 Because we interpret policy language "so that all parts are given meaning," *Secura*, 406 Wis. 2d 297, ¶12 (citation omitted), including a building owner's ongoing, active efforts to lease space as part of the owner's customary operations gives meaning to the owner clause of the Policy's vacancy provision. At a minimum, this interpretation of what constitutes an owner's "customary operations" in this commercial leasing context is a reasonable one for an insured to reach.

¶44 *Myers*, the case on which the circuit court relied and that we described above, presents circumstances in which an owner would not reasonably believe its actions constituted part of its customary operations. Although *Myers* did not interpret the term "customary operations," its facts present an example of an owner who is not actively seeking to lease space in a building and, therefore, not using it to conduct customary operations. It also provides an example of the lack of a regular presence by the owner, which the Eighth Circuit in *Oakdale Mall* tied to the purpose of the vacancy provision that went unfulfilled in that case.

¶45 We agree with the circuit court that Frankenthal's ongoing, active efforts to lease space in the Frankenthal Building are much different from the efforts of the owner in *Myers*, who was not actively seeking to lease units in his apartment building. Unlike the owner in *Myers*, who was present at the building once a month and kept the building units empty, *Myers*, 788 F.2d at 470, Frankenthal kept the space in the Frankenthal Building ready to lease by maintaining a regular presence in the building once or twice a week and by furnishing one of the available spaces. Furthermore, Frankenthal maintained its utilities and actively negotiated leases with prospective tenants.

¶46    Indeed, the owner in *Myers* would not have fulfilled the purpose of the Policy's vacancy provision given the "deserted and unsecured" nature of the building in that case. Thus, the owner's lack of any efforts to lease units and lack of a regular presence in the building in *Myers* show that the owner there was not using the building to conduct customary operations of seeking immediate tenants. In contrast, Frankenthal's continued efforts to lease space in the Frankenthal Building and its regular maintenance of the building show that it was using the Frankenthal Building to conduct its customary operations of seeking immediate tenants for unleased portions of the building. What ultimately matters is that without the Policy defining what the property owner's customary operations are, it is reasonable for an insured to believe such actions *can be deemed part of* its customary operations.

¶47    In sum, we conclude that the term "customary operations" in the vacancy provision of the Policy is ambiguous, and we therefore construe the Policy in favor of coverage for Frankenthal. Had the Policy clarified what was included in "customary operations" or, as other policies have done, identified each property's use or the owner's business pursuit, the result here may have been different. *See, e.g.*, *Pritchett v. Herman Farmers' Mut. Ins. Co.*, 201 Wis. 521, 521, 230 N.W. 706 (1930) (identifying a building's use "as is usual and incidental in the business, as conducted therein, of warehouse and storage"); *Icarus Holdings 2, LLC v. AmGUARD Ins. Co.*, 601 F. Supp. 3d 314, 318, 324 (N.D. Ill. 2022) (characterizing the owner's business pursuit as lessor of residential buildings and dwellings). But the Policy does not do so. As a result, we construe "customary operations" to

include Frankenthal's active, ongoing efforts to lease space in the Frankenthal Building.[9]

> *By the Court.*—Judgment affirmed.

> Recommended for publication in the official reports.

---

[9] Because we conclude that the term "customary operations," as used in the Policy, is ambiguous and construe the Policy in favor of coverage for Frankenthal, we need not address West Bend's alternative argument that it did not waive and was not estopped from invoking the Policy's vacancy provision as a defense to Frankenthal's claim. *See **Patrick Fur Farm, Inc. v. United Vaccines, Inc.***, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 ("[W]e decide cases on the narrowest possible grounds."). We also do not address Frankenthal's alternative argument that even if the Frankenthal Building was vacant, a concurrent cause created the loss and Frankenthal had coverage under the concurrent cause doctrine. *See **id.***